# EXHIBIT 2

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

*In re* Grand Jury Subpoena No. 25-

FILED UNDER SEAL

MEMORANDUM OF LAW IN SUPPORT
OF ELLEN NAKASHIMA'S MOTION TO QUASH

# TABLE OF CONTENTS

INTRODUCTION ........................................................................................................1

BACKGROUND .......................................................................................................3

    I. Ellen Nakashima Is an Award-Winning Journalist for The Washington Post. ......................3

    II.The Trump Administration Has Repeatedly Harassed Nakashima..................................4

    III. The Trump Administration Has Launched a Broader Harassment Campaign Against The Post and Its National Security Reporters. ..........................6

    IV. The Government Takes Coercive Action Against National Security Reporters. ...............7

    V.The Government Served a Grand Jury Subpoena on Nakashima Seeking Testimony About Her Source(s) for a Story That Was Never Published. ...........................10

ARGUMENT..........................................................................................................13

    I. The Subpoena Serves an Improper Purpose........................................................13

        A. The Government Issued Its Subpoena To Harass Nakashima and The Post. ..................14

        B. The Government Issued the Subpoena To Fish for Information and Commandeer Nakashima as an "Investigative Arm of Government."...........................24

    II. Alternatively, a Qualified First Amendment Privilege Applies Because There is Sufficient Evidence To Question the Government's Good Faith. .............................27

    III. Nakashima's Testimony Is Subject to a First Amendment and a Common Law Privilege. ......................................................................................29

CONCLUSION........................................................................................................30

## CASES

*Ashcraft v. Conoco*, 218 F.3d 282 (4th Cir. 2000)......................................................................29

*Branzburg v. Hayes*, 408 U.S. 665 (1972)..................................................................... *passim*

*Gonzalez v. Trevino*, 602 U.S. 653 (2024)...................................................................................22

*In re 2025 UPMC Subpoena*, 2025 WL 3724705 (W.D. Pa. Dec. 24, 2025)...................15, 17

*In re Admin. Subpoena No. 25-1431-019*, 800 F. Supp. 3d 229 (D. Mass. 2025)....................16

*In re Children's Nat'l Hosp.*, 2026 WL 160792 (D. Md. Jan. 21, 2026) ..................................15

*In re DOJ Admin. Subpoena No. 25-1431-030*,
    2026 WL 33398 (D. Colo. Jan. 5, 2026)..............................................................................5

*In re Grand Jury 87-3 Subpoena Duces Tecum*, 955 F.2d 229 (4th Cir. 1992) ..................13, 24

*In re Grand Jury Subpoena*, 175 F.3d 332 (4th Cir. 1999) .......................................3, 13, 14

*In re Grand Jury Subpoena, Judith Miller*, 438 F.3d 1141 (D.C. Cir. 2006)...........................13

*In re Grand Jury Subpoenas*, 2026 WL 710202 (D.D.C. March 13, 2026) ....................15, 16, 20

*In re Grand Jury Subpoenas, No. 82-Y-22 and 82-T-23*,
    1982 BL 66 (D. Colo. Feb. 19, 1982).................................................................................28

*In re Search of Real Prop. & Premises of Hannah Natanson*,
    No. 1:26-sw-00054 (WBP), 2026 WL 510727 (E.D. Va. Feb. 24, 2026) .........9, 10, 12, 21, 22

*In re Shain*, 978 F.2d 850 (4th Cir. 1992)..................................................................24, 27, 28

*In re Subpoena Duces Tecum No. 25-1431-016*,
    2025 WL 3562151 (W.D. Wash. Sep. 3, 2025)..................................................................21

*In re Subpoena No. 25-1431-014*, 810 F. Supp. 3d 555 (E.D. Pa. 2025) ................................15

*In re Request from the U.K.*, 718 F.3d 13 (1st Cir. 2013) .......................................................30

*In re Williams*, 766 F. Supp. 358 (W.D. Pa. 1991),
    *order aff'd*, 963 F.2d 567 (3d Cir. 1992).................................................................28, 29, 30

*La Rouche v. NBC*, 780 F.2d 1134 (4th Cir. 1986)...................................................................27

*Media Matters for Am. v. FTC*, 805 F. Supp. 3d 105 (D.D.C. 2025) ........................15, 16, 17, 20

*N.Y. Times Co. v. DOD*, 2026 WL 788689 (D.D.C. Mar. 20, 2026)..................8, 9, 18, 19, 26

*NPR, Inc. v. Trump*, 2026 WL 877434 (D.D.C. Mar. 31, 2026) ......................................17

*Queerdoc, PLLC v. United States DOJ*, 807 F. Supp. 3d 1295 (W.D. Wash. 2025)........15, 17, 21

*United States v. Bailey*, 228 F.3d 341 (4th Cir. 2000)......................................16

*United States v. Capers*, 708 F.3d 1286 (11th Cir. 2013)......................................30

*United States v. Morton Salt Co.*, 338 U.S. 632 (1950)......................................16

*United States v. Powell*, 379 U.S. 48 (1964) ......................................16

*United States v. R. Enters.*, 498 U.S. 292 (1991)......................................3, 13, 16, 24

*United States v. Sterling*, 724 F.3d 482 (4th Cir. 2013)......................................*passim*

*United States v. Tan*, 16 F.4th 1346 (9th Cir. 2021)......................................16

*United States v. Whispering Oaks Residential Care Facility, LLC*,
   673 F.3d 813 (8th Cir. 2012) ......................................16

## RULES, STATUTES, AND REGULATIONS

28 C.F.R. § 50.10......................................23, 24, 25, 26, 28

18 U.S.C. § 793......................................21, 22

Federal Rule of Criminal Procedure 17(c)(2) ......................................3, 13, 27

## OTHER AUTHORITIES

Press Release, U.S. Atty's Off. E.D. Va., New York State Attorney General Indicted
   (Oct. 9, 2025), https://perma.cc/57T2-G3TP......................................15

*United States v. Comey*, No. 25-cr-272, ECF No. 1 (Indictment) (E.D. Va. Sep. 25, 2025)........15

## INTRODUCTION

"Why isn't this b!tch in jail?" That was how Roger Stone, President Trump's confidante and former political advisor, responded to a post by Director of National Intelligence Tulsi Gabbard complaining that Ellen Nakashima, a three-time Pulitzer Prize-winning reporter for The Washington Post, had called members of her staff rather than going through the official press office. *See* Latcovich Decl. ¶ 8(e).[1] Lieutenant General Michael Flynn, the President's former National Security Advisor and another confidante, agreed that "The WAPO should be shut down." *Id.* ¶ 8(d). The Chief Pentagon spokesman called Nakashima's reporting "irresponsible anonymously sourced garbage." *Id.* ¶ 9(l). Director Gabbard herself accused Nakashima of writing "complete bullshit in the pages of the Washington Post" and of "lying and not telling the truth to the American people." *Id.* ¶ 8(m). And the White House named her "Media Offender of the Week," for an article about the Pentagon's boat strike attacks in the Caribbean and posted her photo on the official White House social media account. *Id.* ¶ 11.

These are not examples of the normal give-and-take that all administrations have with the press. Instead, the highest levels of the Executive Branch are engaged in an intimidation campaign against a journalist whose reporting the Trump Administration does not like. And it has now culminated in a blatant abuse of the grand jury process: On March 2, 2026, the United States Attorney's Office for the Eastern District of Virginia served a subpoena compelling Nakashima to testify about a story she never published, based on information largely already in the public domain, concerning ███████████████████████████. *See id.* ¶ 5; *id.*, Ex. A; Nakashima Decl. ¶¶ 7-10, 18-19. The government's purpose is not law enforcement. Its purpose

---

[1] Movant has included citations to all referenced social media posts, press briefing statements, articles, and other public comments in the Latcovich Declaration. PDFs of each post have also been included as exhibits to the declaration for ease of reference.

is transparent harassment of a prominent national security reporter it dislikes, and the chilling of her sources.

Consider the facts here. In January 2026, Nakashima reached out to  for comment on a potential article about ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓. Nakashima Decl. ¶¶ 12-17. These events had already been reported publicly. ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ Nakashima sought verification and gave the government an opportunity to respond. *Id.* ¶ 12. ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ There was no claim that Nakashima possessed classified information. No request to stop reporting. No substantive pushback whatsoever. Nakashima ultimately set aside the story, and she never published an article on the topic. *Id.* ¶ 18.

Two months later—and only six days after a federal magistrate judge ruled against the government in its raid of another Post reporter's home for her reporting on Pentagon activities—the government served this grand jury subpoena. *See* Latcovich Decl. ¶ 18. The timing is no coincidence. This Administration has made no secret of its hostility toward The Post and its national security reporters. President Trump has called The Post's stories "Fake Stories" from "fools and stupid people." *Id.* ¶ 19(b). Pentagon spokespeople have called The Post's reporters "disgusting," "scum," and "genuinely bad at your job," and one called for "severe punishment" against them in connection with their Pentagon reporting. *Id.* ¶ 14.

Against this backdrop, the government's purpose is unmistakable. The government is not investigating a crime, but rather harassing and punishing a reporter for doing her job—in connection with an article that she never even published. It is retaliating against The Post for Pentagon coverage the Administration dislikes. And it is sending a message—as it did in the recent raid on a Post reporter's home—that this Administration will use the coercive power of the State to chill reporters and their sources.

The Supreme Court has long recognized that grand juries may not "select targets of investigation out of malice or an intent to harass." *United States v. R. Enters.*, 498 U.S. 292, 299 (1991). When a subpoena's "sole or dominant purpose" is illegitimate, it must be quashed. *In re Grand Jury Subpoena*, 175 F.3d 332, 340 (4th Cir. 1999) (citation omitted). And the Supreme Court has specifically warned that "[o]fficial harassment of the press undertaken not for purposes of law enforcement but to disrupt a reporter's relationship with his news sources" has "no justification" and cannot stand. *Branzburg v. Hayes*, 408 U.S. 665, 707-08 (1972). That is precisely what is happening here.

This Court should not bless this abuse of the grand jury process against the free press. The evidence of harassment is overwhelming. *See generally* Latcovich Decl. And the consequences of allowing this subpoena to stand—for Nakashima, for The Post, and for every national security journalist who might think twice before picking up the phone to ask the government for comment—are grave. We respectfully urge the Court to quash this subpoena under Federal Rule of Criminal Procedure 17(c)(2) and the First Amendment.

## BACKGROUND

### I.  Ellen Nakashima Is an Award-Winning Journalist for The Washington Post.

Ellen Nakashima is a national security reporter for The Post. Nakashima Decl. ¶ 2. In her more than three decades of journalism, Nakashima has earned some of the profession's highest

honors, including being a member of three Pulitzer-Prize-winning teams. *See id.* ¶ 5. Not only has her reporting earned her accolades, it has also caught the attention and ire of the Trump Administration. *See generally* Latcovich Decl.

## II. The Trump Administration Has Repeatedly Harassed Nakashima.

This subpoena is not the Trump Administration's first attempt to intimidate and silence Nakashima. The President and his confidantes, advisors, and staff began targeting her during the first Trump Administration and have only escalated their attacks in the second. For example, in November 2020, President Trump's first Attorney General approved a highly unusual, no-notice subpoena for phone records and information from email accounts used by three Post reporters, including Nakashima. *See* Latcovich Decl. ¶ 13. The subpoena was issued pursuant to the Trump Administration's investigation into her Pulitzer-Prize-winning reporting about Russian interference in the 2016 election. *Id.* The Department of Justice ("DOJ") closed the investigation in May 2021 with no action against Nakashima or other Post reporters. *Id.*

But that did not stop multiple senior members of the second Trump Administration from criticizing Nakashima for her reporting, engaging in a sustained campaign of public vilification during the President's second term. *See id.* ¶¶ 8-12 (citing numerous examples). Much of the Administration's hostility continues to stem from Nakashima's participation in nearly decade-old Pulitzer-Prize-winning reporting on Russian interference in the 2016 election. In the past year alone, President Trump called that reporting **"a total hoax."** *Id.* ¶ 8(b) (May 2025).[2] And during a press briefing, the White House Press Secretary said that Nakashima and her fellow reporters **"were ridiculously awarded** Pulitzer Prizes for their perpetuation of **this hoax."** *Id.* ¶ 8(k) (July 2025).

---

[2] The bolded text throughout this motion is added emphasis.

4

Director of National Intelligence Tulsi Gabbard appeared on Fox News and criticized "Ellen Nakashima from The Washington Post, who, by the way, went on to win a Pulitzer Prize because for years, she was **so good at lying and not telling the truth** to the American people that they gave her an award for it. *Id.* ¶ 8(j) (July 2025). Gabbard and her staff called Nakashima out by name on social media for "**advanc[ing] falsehoods**," reporting "**fake intelligence,**" penning "**the dumbest sentence I've seen from the Washington Post,**" and writing "**complete bullshit** in the pages of the Washington Post." *Id.* ¶ 8.

Gabbard further attacked Nakashima on social media, accusing her of "actively harassing [Office of Director of National Intelligence] staff" because she was calling staff members—i.e., seeking to interview them—rather than "reaching out to [the] press office." *Id.* ¶ 9(c) (July 2025). President Trump's confidantes and former advisors responded in kind:

- General Mike Flynn responded, "**The WAPO should be shut down.** Take any and all taxpayer funds from them and all of their reporters. Do not allow them entrance to any USG facility without an escort. **Do not allow anyone in the entire USIC to take any of their questions or to do any interviews with them.** There's more, but for now that's enough." *Id.* ¶ 8(d).

- Roger Stone took it even further, asking, "**Why isn't this b!tch in jail?**" *Id.* ¶ 8(e).

One of the President's campaign advisors called Nakashima "**the worst of the worst.**" *Id.* ¶ 8(h) (July 2025). And Chief Pentagon spokesman criticized her reporting as "**irresponsible anonymously sourced garbage.**" *Id.* ¶ 8(l) (Oct. 2025).

In December 2025, the Administration named Nakashima the "**Media Offender of the Week**" on the White House's official website dedicated to tracking supposedly "false and misleading stories," for an article she co-wrote about Defense Department boat strikes in the Caribbean. *Id.* ¶ 11. The White House posted her name and photo on its official social media account in a further effort to intimidate her. *Id.* The article caught the immediate attention of

5

Defense Secretary Pete Hegseth who called it "fabricated, inflammatory, and derogatory reporting" from "fake news" on social media the same day it was published. *Id.*

The Administration's persecution of Nakashima is not limited to rhetorical abuse. It is designed to punish her and The Post for publishing articles that the Executive Branch does not like, to interfere with her confidential source relationships, and to silence her reporting on national security matters—the same improper motives behind this grand jury subpoena.

### III. The Trump Administration Has Launched a Broader Harassment Campaign Against The Post and Its National Security Reporters.

The Administration's targeting of Nakashima is part of a broader, well-documented pattern of hostility toward The Post and its national security reporters. The harassment goes far beyond the Administration's quotidian "Fake News" accusations. *See, e.g.*, Latcovich Decl. ¶¶ 8, 11, 14, 19. It comes from the highest levels of the Executive Branch. Some of President Trump's many public comments denigrating The Post include:

- "The Washington Post is **doing horribly.** They're all doing badly because people don't buy it anymore." *Id.* ¶ 19(d).

- "Washington Post is **doing no business.** They're losing all their business. **Nobody believes them.**" *Id.* ¶ 19(f).

- "And you have to understand, I'm being judged by these **bad people back there,** the fake news. [Audience boos] So, anything I say that's slightly off, I get like headlines—Donald Trump exaggerated or Donald Trump lied. They give me **Pinocchio's, Washington Post, a Pinocchio, they lie every day.** They give me a Pinocchio." *Id.* ¶ 19(j).

- During a press gaggle on Air Force One, President Trump said to a Post reporter, "[Y]ou're having a hard time getting readers. The Washington Post is **doing very poorly.** Go ahead. You have a **very bad attitude.**" *Id.* ¶ 19(l).

- President Trump posted a meme that lists **"Massive Layoffs" at The Post** under the headline, "President Trump is reshaping the media." *Id.* ¶ 19(n).

In recent months, others in this Administration have joined in his attacks on The Post. The White House Press Secretary called The Post "**pathetic.**" *Id.* ¶ 19(g). Vice President JD Vance disclosed in an interview that he texted The Post's owner, Jeff Bezos, to suggest that a reporter from conservative news outlet Breitbart should "run your entire political reporting shop." *Id.* ¶ 19(h). Other Executive Branch officials described The Post's articles as "**fake crap,**" "**a disgusting lie,**" "**phony,**" and "**dishonest left-wing hackery.**" *Id.* ¶ 14.

Notably, the Pentagon has followed suit, with Pentagon press secretaries recently calling The Post's national security reporters "**disgusting,**" "**scum,**" "**genuinely bad at your job,**" and "**a liar.**" *Id.* ¶ 14. These public posts call the reporters out by name. One even called for "**severe punishment**" against The Post's Pentagon reporters. *Id.* ¶ 14(f).

## IV. The Government Takes Coercive Action Against National Security Reporters.

The second Trump Administration's harassment has extended past crude insults on social media and verbal attacks in press briefings. The Administration has taken concrete steps to silence journalists through threats, policies, and unprecedented legal processes that punish the press for disfavored reporting, particularly as it relates to national security and foreign policy— Nakashima's areas of expertise.

*Policies.* The Administration has retaliated against the press by limiting access to the Executive Branch. In February 2025, the White House banned Associated Press journalists from the Oval Office and Air Force One for refusing to use President Trump's preferred term, "Gulf of America." *Id.* ¶ 20(c). Similarly, in the midst of March 2026 reporting related to the military's involvement in Iran, the Pentagon banned press photographers after they published photos of Defense Secretary Hegseth that his staff did not like. *Id.* ¶ 20(g).

Part of the DOJ and Pentagon's policing of the press has involved a crackdown on alleged leakers—government workers who divulge information to the press. Last year, former Attorney

General Pam Bondi issued a memorandum rescinding prior DOJ guidelines that limited DOJ's ability to obtain records and compel testimony from reporters. *Id.* ¶ 20(d). (Although the new regulations are less protective of the press, the DOJ left many of the longstanding guidelines in place, which notably were not followed in this case. *See infra* p. 22-24.)

The Department of Defense also implemented new policies that restrict reporters' access to large areas of the Pentagon, even if the reporters were credentialed to cover the Department, and expanded the restrictions to require reporters to agree to only publish information that the Department approved. Latcovich Decl. ¶ 21. The Department required reporters to sign an acknowledgment of its new media policies in order to maintain Pentagon access. *See N.Y. Times Co. v. DOD*, 2026 WL 788689, at *6-7, *14 (D.D.C. Mar. 20, 2026). Reporters from most major news outlets, including Fox News and The Wall Street Journal, refused. *Id.* This included the Post's three national security reporters, Tara Copp, Alex Horton, and Dan Lamothe, whose Pentagon access credentials were revoked as a result. Latcovich Decl. ¶ 23. Instead, Post reporters and their colleagues from other mainstream news organization have been replaced by Trump-friendly partisans, like Laura Loomer, LindellTV, and an arm of Turning Point USA.

The New York Times sued the Department of Defense, challenging the policy. *N.Y. Times*, 2026 WL 788689, at *1. On March 20, 2026, the court granted the Times' summary judgment motion and held that the policy violated the First and Fifth Amendments. *Id.* ("Those who drafted the First Amendment believed that the nation's security requires a free press and an informed people . . . . That principle has preserved the nation's security for almost 250 years. It must not be abandoned now."). As part of its holding that the press policy was unconstitutional and viewpoint-discriminatory, the court specifically emphasized that the Department of Defense had found that a tip line used by The Post violated its policy, while simultaneously blessing similar

8

requests for tips from right-wing commentators. *Id.* at \*16 ("The Court is unpersuaded that there is any distinction between The Washington Post's tip line and Ms. Loomer's, other than that The Washington Post's motto is 'Democracy Dies in Darkness,' while Ms. Loomer's apparently is willingness to 'serve [the] commander in chief.'" (alteration in original) (citation omitted)).

Three days after the court issued its ruling, the Department announced that it would move all journalists from their office in the Pentagon to a separate, external facility. Latcovich Decl. ¶ 25. The government's end run around the adverse court order is currently subject to further litigation. *See id.*

*Threats.* The Administration has used harsh rhetoric to threaten the national security press regarding its reporting on the Administration's recent military activities. For example, the President called for "**Charges for TREASON**" to be brought against national security journalists who reported negatively about Iran operations.[3] *Id.* ¶ 20(j). And during a press briefing, Defense Secretary Hegseth told the media what headlines he and the Administration wanted to see them report about Iran. *Id.* ¶ 20(h). Throughout the second Trump Administration, Pentagon press secretaries have called out The Post's national security reporters on numerous occasions. *See id.* ¶ 14.

*Raid of a Washington Post Reporter's Home.* The grand jury subpoena to Nakashima is not the first coercive act against a Post reporter that the government has taken this year. In January 2026, the FBI raided the home of Nakashima's colleague, Post reporter Hannah Natanson—an unprecedented attack on the press in connection with a national security leak investigation. *See In*

---

[3] The President made this threat in support of the Federal Communications Commission Chairman's warning on social media that "Broadcasters that are running hoaxes and news distortions—also known as the fake news—have a chance now to correct course before their license renewals come up." *Id.* ¶ 20(i).

*re Search of Real Prop. & Premises of Hannah Natanson ("Natanson")*, No. 1:26-sw-00054 (WBP), 2026 WL 510727, at *3 (E.D. Va. Feb. 24, 2026). Former Attorney General Bondi credited the idea for the raid to the Department of Defense—the same Department that has endlessly berated The Post's national security reporters, enacted draconian press policies, and attempted to control wartime reporting. *See* Latcovich Decl. ¶ 15.

The Post and Natanson moved for a standstill order, which the Court granted over the government's objection. *See Natanson*, 2026 WL 510727, at *3. On February 20, 2026, the Court scolded the government in open court for failing to raise the Privacy Protection Act ("PPA") when applying for the warrant to search Natanson's home, noting that it may have denied the warrant if the government had been transparent. *See* Latcovich Decl. ¶ 17. Four days later, the Court rejected the government's filter team proposal and again admonished the government for not disclosing the PPA. *Natanson*, 2026 WL 510727, at *7, *11-12.

Under this backdrop of animosity toward Nakashima, The Post, the press, and national security reporters in particular—and only days after suffering a prominent court loss challenging the Natanson raid—the government served a subpoena on Post reporter Nakashima.

V. **The Government Served a Grand Jury Subpoena on Nakashima Seeking Testimony About Her Source(s) for a Story That Was Never Published.**



[REDACTED]

Consistent with standard journalistic practice, Nakashima contacted [REDACTED] to seek comment [REDACTED] In her outreach, Nakashima provided top-line information about what she intended to report in order to give [REDACTED] an opportunity to offer comment, provide pushback, or offer guidance. She contacted [REDACTED] via the Signal messaging application. *Id.* ¶ 14. [REDACTED] did not provide any substantive comment or pushback on the underlying reporting. *Id.* ¶ 15. [REDACTED] Nakashima understood [REDACTED] was not pushing back on the accuracy of her reporting. *Id.* ¶¶ 15-16. Nakashima also reached out separately via email to [REDACTED] for comment; it similarly offered no pushback on Nakashima's reporting. *Id.* ¶ 17; *id.*, Ex. A.

At no point did the government request that Nakashima and The Post refrain from publishing the potential story on national security grounds, such as a risk of endangering the lives of military personnel or other U.S. assets. *Id.* ¶ 20. In the past, when the government has made such a request, The Post has carefully considered it. *Id.* No such request was made here. *Id.*

Nakashima ultimately set aside the story. *Id.* ¶ 18. The Post never published an article



Nevertheless, on March 2, 2026, Nakashima received a grand jury subpoena for testimony from the government, directing her to appear before a grand jury on April 7, 2026. *See* Latcovich Decl. ¶ 5; *id.*, Ex. A. Through subsequent communications with the government, counsel for Nakashima learned that the government wishes for her to testify about her request for comment to ▮▮▮ and, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮" *Id.* ¶ 7.

The timing of the subpoena is telling. Nakashima's request for comment occurred in early January 2026 and ▮▮▮▮▮▮▮▮▮▮▮▮▮▮ yet the government issued the subpoena in March—immediately after the Court corralled the government's effort to search Post reporter Hannah Natanson's records. Latcovich Decl. ¶ 18.

Specifically, the government served the grand jury subpoena on March 2, 2026—only ten days after the court admonished the government in open court in the first *Natanson* hearing, only six days after the Court's adverse order rejecting the government's filter team proposal, and literally the day before the parties were to appear before the Court to discuss how to implement the review without the government's filter team. *Id.* ¶¶ 5, 17-18. This timing strongly suggests that the subpoena is part of the Administration's ongoing campaign to target and punish The Post and its reporters for reporting about the Pentagon's activities that the Administration does not like.

With this subpoena, the government discourages reporters like Nakashima from doing what all responsible journalists do—verifying information she received and giving the government an opportunity to comment or correct it—even though she never published anything.

## ARGUMENT

### I. The Subpoena Serves an Improper Purpose.

While a grand jury's investigative powers are broad, they "are not unlimited and are subject to the supervision of a judge." *Branzburg v. Hayes*, 408 U.S. 665, 688 (1972). Grand juries may seek information bearing on an investigation, but they "are not licensed to engage in arbitrary fishing expeditions, nor may they select targets of investigation out of malice or an intent to harass." *United States v. R. Enters., Inc.*, 498 U.S. 292, 299 (1991). When the "sole or dominant purpose" of seeking even relevant evidence is an "illegitimate purpose," *In re Grand Jury Subpoena*, 175 F.3d 332, 340 (4th Cir. 1999) (citation omitted), the subpoena should be quashed under Federal Rule of Criminal Procedure 17(c)(2).

Federal Rule of Criminal Procedure 17(c)(2) allows courts to "quash or modify the subpoena if compliance would be unreasonable or oppressive." *Id.* What is reasonable under the Rule "depends on the context." *R. Enters.*, 498 U.S. at 299 (citation omitted). Where "values of expression are potentially implicated," the Fourth Circuit has directed district courts to scrutinize "with special sensitivity" whether the government is engaging in "fishing expeditions" or has "select[ed] targets of investigation out of malice or an intent to harass." *In re Grand Jury 87-3 Subpoena Duces Tecum*, 955 F.2d 229, 234 (4th Cir. 1992) (citation omitted); *see In re Grand Jury Subpoena, Judith Miller*, 438 F.3d 1141, 1164 (D.C. Cir. 2006) (Tatel, J. concurring) (*Branzburg* meant "that the First Amendment demands a broader notion of 'harassment' for journalists than for other witnesses").

In the specific context of grand jury subpoenas issued to journalists, the Supreme Court has made clear that it is unreasonable to use subpoenas for "[o]fficial harassment of the press undertaken not for purposes of law enforcement but to disrupt a reporter's relationship with his news sources." *Branzburg*, 408 U.S. at 707-08. Indeed, there is "no justification" for using grand

13

jury subpoenas in such a manner. *Id.* It is *also* improper to use grand jury subpoenas to "'annex' the news media as 'an investigative arm of government.'" *United States v. Sterling*, 724 F.3d 482, 497, 499 (4th Cir. 2013) (quoting *Branzburg*, 408 U.S. at 709 (Powell, J., concurring)).

The *Branzburg* Court anticipated that the Attorney General's "set of rules for federal officials in connection with subpoenaing members of the press to testify before grand juries or at criminal trials" would ensure the federal government did not abuse its investigative powers with respect to journalists. 408 U.S. at 706-07. Indeed, it predicted those guidelines "may prove wholly sufficient to resolve the bulk of disagreements and controversies between press and federal officials." *Id.* at 707. And, for decades, they have. There are no publicly documented instances of grand jury subpoenas being used to harass journalists, and only a few instances where journalists have even invoked *Branzburg*'s bad-faith exception.

But the government, in this case, sidestepped those procedural safeguards. *Infra* pp. 22-27. And, in doing so, it issued precisely the type of abusive subpoena the Supreme Court expected those regulations to guard against. The subpoena should be quashed both because it was issued to "harass" Nakashima and The Post, and also because the government transparently seeks to annex Nakashima as an "investigative arm of the government" regarding a hypothetical article that The Post never even published. *See* Nakashima Decl. ¶ 18.

## A. The Government Issued Its Subpoena To Harass Nakashima and The Post.

Until recently, the federal government has rarely used its investigative powers out of malice or for harassment. Most grand jury subpoenas quashed for an "improper purpose" have historically involved prosecutors seeking to "obtain documents for use in [a] civil action." *In re Grand Jury Subpoena*, 175 F.3d at 340. But as the current Administration has lowered guardrails against administrative abuse and targeted perceived political enemies, courts have needed to intervene at

an alarming rate to quash subpoenas issued for another "improper purpose": to pressure or punish ideological opponents.[4]

Just weeks ago, the U.S. District Court for the District of Columbia quashed grand jury subpoenas issued to the Federal Reserve Board seeking evidence as part of a criminal investigation into Federal Reserve Chair Jerome Powell. The district court found "abundant evidence that the [grand jury] subpoenas' dominant (if not sole) purpose [was] to harass and pressure Powell either to yield to the President['s]" desire to lower interest rates "or to resign and make way for a Fed Chair who will." *In re Grand Jury Subpoenas*, 2026 WL 710202, at *1 (D.D.C. March 13, 2026) ("*Powell*").

Last year, the same court enjoined a civil investigative demand ("CID") issued by the Federal Trade Commission ("FTC") to Media Matters, a liberal media watchdog. The court found the CID was likely issued for the "improper purpose" of retaliating against Media Matters for an article Media Matters had run criticizing presidential-advisor Elon Musk and his company, X. *Media Matters for Am. v. FTC*, 805 F. Supp. 3d 105, 119 (D.D.C. 2025).

And over the last few months, courts across the country have overwhelmingly quashed the dozens of administrative subpoenas this Administration issued to children's hospitals and medical providers of "gender-related care" under the guise of investigating violations of the Federal Food, Drug, and Cosmetic Act.[5] These courts found it "abundantly clear that the true purpose of issuing

---

[4] This Administration has also not hesitated to use its prosecutorial powers against the President's opponents, including James Comey and Letitia James. *See United States v. Comey*, No. 25-cr-272, ECF No. 1 (Indictment) (E.D. Va. Sep. 25, 2025); Press Release, U.S. Atty's Off. E.D. Va., New York State Attorney General Indicted (Oct. 9, 2025), https://perma.cc/57T2-G3TP.

[5] These decisions include *In re Children's National Hospital*, 2026 WL 160792, at *8 (D. Md. Jan. 21, 2026); *In re DOJ Administrative Subpoena No. 25-1431-030*, 2026 WL 33398, at *7 (D. Colo. Jan. 5, 2026); *In re 2025 UPMC Subpoena*, 2025 WL 3724705, at *1 (W.D. Pa. Dec. 24, 2025); *In re Subpoena No. 25-1431-014*, 810 F. Supp. 3d 555, 577 & n.109 (E.D. Pa. 2025); *Queerdoc,*

the subpoena[s]" was to "harass and intimidate" medical providers "to stop providing [gender-affirming] care, and to dissuade patients from seeking such care."[6] *In re Admin. Subpoena No. 25-1431-019*, 800 F. Supp. 3d 229, 239 (D. Mass. 2025).

Many of the same factors that in those cases convinced courts that the subpoenas and investigative demands were issued out of malice or an intent to harass are present here.

1. *Public Comments.* In *Powell*, *Media Matters*, and the gender-care cases, as here, members of the Administration, presidential advisors, and even the President himself publicly disparaged the targeted entities and individuals or the work that they performed. In *Powell*, the court documented a litany of X and Truth Social posts and other public statements by President Trump and his advisors "publicly berat[ing]" the Federal Reserve for refusing to lower interest rates. 2026 WL 710202, at *2. The court noted that the President had "specifically aimed his anger at Chair Powell" and, "[f]or years" on X and Truth Social, had "berated Powell, threatened him, ordered him to lower rates, or done all three at once." *Id.* at *3, *8-9. The fact that the President had "spent years" berating Powell "strongly impl[ied] that this investigation was launched for an improper purpose, as were the resulting subpoenas." *Id.* at *9.

---

*PLLC v. United States DOJ*, 807 F. Supp. 3d 1295, 1304 (W.D. Wash. 2025); *In re Administrative Subpoena No. 25-1431-019*, 800 F. Supp. 3d 229, 239 (D. Mass. 2025).

[6] An administrative subpoena is distinct from but "analogous to the Grand Jury" subpoena. *United States v. Morton Salt Co.*, 338 U.S. 632, 642 (1950). The Fourth Circuit has held that administrative subpoenas, like grand jury subpoenas, may not be used to "engag[e] in arbitrary fishing expeditions" and cannot "select[] targets of investigation out of malice or an intent to harass." *United States v. Bailey*, 228 F.3d 341, 349 (4th Cir. 2000) (quoting *R. Enters.*, 498 U.S. at 299); *see also United States v. Powell*, 379 U.S. 48, 58 (1964) (IRS summons may not be "issued for an improper purpose, such as to harass," "put pressure on [a party] to settle a collateral dispute, or for any other purpose reflecting on the good faith of the particular investigation"); *see, e.g., United States v. Tan*, 16 F.4th 1346, 1353 (9th Cir. 2021) (applying *Powell* to agency subpoenas outside the context of IRS summons); *United States v. Whispering Oaks Residential Care Facility, LLC*, 673 F.3d 813, 819 (8th Cir. 2012) (same).

Similarly, in *Media Matters*, the court cited social media posts, comments in interviews, and memos by the FTC Chairman, FTC senior staffers, and presidential advisors "characterizing Media Matters and [FTC's] investigative push in ideological terms." 805 F. Supp. 3d at 134 (citation omitted). These comments signaled that the FTC was "chomping at the bit to 'take investigative steps in the new administration under President Trump' to make 'progressives' like Media Matters 'give up.'" *Id.* at 136 (citation omitted).

And in the gender-care cases, multiple courts cited the Administration's "own repeated declarations" in executive orders and a "inflammatory press release," stating that its true purpose was "to end the very practice it claims to be merely investigating," gender-related care. *Queerdoc, PLLC v. U.S. DOJ*, 807 F. Supp. 3d 1295, 1301-03 (W.D. Wash. 2025); *see also In re 2025 UPMC Subpoena*. 2025 WL 3724705, at *2 (W.D. Pa. Dec. 24, 2025) (finding that the Administration's "inflammatory language" and "rhetoric" did "not cast a favorable light" on the good faith of the government's investigation).

Similar comments from the Administration have also contributed to courts' recent findings that the Trump Administration is unconstitutionally retaliating against certain media entities because of their unfavorable or "leftist" news coverage. In a lawsuit challenging the government's defunding of PBS and NPR, the court commented that it "is difficult to conceive of clearer evidence that a government action is targeted at viewpoints that the President does not like and seeks to squelch" than the government's own partisan rhetoric in the President's executive order and accompanying press release. *NPR, Inc. v. Trump*, 2026 WL 877434, at *24 (D.D.C. Mar. 31, 2026). In the New York Times' challenge to the Pentagon's press policy, the court cited social media posts by members of the Administration in finding that the "undisputed evidence reflects

the policy's true purpose and practical effect: to weed out disfavored journalists." *N.Y. Times*, 2026 WL 788689, at \*6-7, \*13-14.

The same Administration's inflammatory and disparaging comments about Nakashima and The Post are similarly strong evidence of malice and harassment in this case. As detailed above, this Administration has made no secret of its disdain for both The Post and Nakashima. *See supra* pp. 4-9. National security and Pentagon officials have frequently expressed extreme irritation that Nakashima has been able to report on national security affairs, calling her stories "anonymously sourced garbage" and "complete bullshit." Latcovich Decl. ¶ 8(l)-(m). Director Gabbard has characterized Nakashima's ordinary newsgathering as "harassing people who work within the Intelligence Community," *id.* ¶ 8(c), causing President Trump's confidante and former advisor to ask, "Why isn't this b!tch in jail?" *Id.* ¶ 8(e). Director Gabbard and Press Secretary Karoline Leavitt recently called for Nakashima to be stripped of her Pulitzer Prize for her reporting *from nearly a decade ago*, on Russian interference in the 2016 presidential election. *Id.* ¶ 8(j)-(k). A campaign advisor to President Trump asked on X, "How is Ellen [Nakashima] still employed?" *Id.* ¶ 8(h). The White House, meanwhile, has featured The Post as the "Media Offender of the Week" for a Pentagon story co-written by Nakashima. *Id.* ¶ 11. Defense Secretary Hegseth called that same article "fabricated, inflammatory, and derogatory reporting" from "fake news." *Id.*

The Administration's contempt for The Post is just as well-documented. *See supra* pp. 6-9. President Trump has called The Post's stories critical of his Administration "Fake Stories" that "hurt and demean our Country." *Id.* ¶ 19(b). He has referred to the Post's reporters as "fools and stupid people" and characterized them as "very untruthful." *Id.* He heckled a Post reporter in a press gaggle. *Id.* ¶ 19(l). And the President took credit for recent media layoffs—including at The Post—posting a meme saying, "President Trump is Reshaping the Media." *Id.* ¶ 19(n). Others in

his Administration have followed suit. Press Secretary Leavitt has called The Post "pathetic." *Id.* ¶ 19(g). The Post has also been heavily featured on The White House's "Offender Hall of Shame," which lists The Post as #1 on the "Media Offender Leaderboard." *Id.* ¶ 10.

The President and those close to his Administration have targeted The Post in other ways as well. In November 2020, during President Trump's first Administration, DOJ approved a highly unusual no-notice subpoena for phone records and information from email accounts used by three Post reporters, including Nakashima. *Id.* ¶ 13. Last year, the Department of Defense said that a tip line used by The Post violated the Department's new policy while permitting similar requests for tips from right-wing media outlets. *N.Y. Times*, 2026 WL 788689 at *6. And then, at the beginning of this year, the government executed a search warrant at the home of a Post reporter because of her newsgathering activities. Latcovich Decl. ¶ 15.

The Administration's particular hostility toward national security reporting cannot be ignored, given Nakashima's national security beat and the alleged focus of this subpoena on her potential reporting ███████. Indeed, the Pentagon's unconstitutional press policies, the President's threats of "Charges for TREASON," and the Pentagon's calls for "severe punishment" of The Post's national security reporters evidences the government's goal to eliminate that type of reporting. *Id.* ¶¶ 14(f), 20(j).

The Administration's rhetoric and conduct targeting The Post is strong evidence of its improper purpose: to silence Nakashima's reporting, chill her confidential sources, and to convince The Post to "give up" on its reporting about this Administration, and its military and national security operations specifically.

2. *Timing.* The timing of the subpoena, too, suggests that the investigation is a pretext and that the subpoena was issued with animus.

19

In *Media Matters*, the court found it significant that the CID was issued to Media Matters "on the heels of other failed attempts to seek retribution" against Media Matters. 805 F. Supp. 3d at 135. Specifically, the CID came shortly after the D.C. Circuit dismissed the appeal of an injunction against a CID that Missouri had issued to Media Matters and just a month after presidential-advisor Elon Musk's lawsuits against Media Matters—which had been "cheered" by another advisor to the President—were preliminarily enjoined. *Id.* Similarly, in *Powell*, the court noted that the U.S. Attorney's Office served two subpoenas on the Federal Reserve "[t]he next day" after the "the President reportedly excoriated a gathering of U.S. Attorneys for not moving faster to prosecute his opponents." 2026 WL 710202, at *3.

The timing of the government's grand jury subpoena to Nakashima similarly speaks to the government's motive. Nakashima reached out to ████████████████ for comment in mid-January 2026. Nakashima Decl. ¶ 12. The Post never ran a story on these issues. *Id.* ¶ 18. Nonetheless, seven weeks later—with no notice or warning—the government subpoenaed Nakashima for testimony regarding her outreach to ███████ *Id.* ¶ 19.

But a lot went down in that seven-week period. About the same day that Nakashima reached out to ███████ January 14, the FBI raided the home of Post reporter Hannah Natanson and seized a trove of her newsgathering materials—an unprecedented attack on the press. Latcovich Decl. ¶ 15. The raid in that case purportedly related to Natanson's articles about military activities in Venezuela—the same topic that earned Nakashima the title, "Media Offender of the Week" ██████████████████████████████████

Over the next several weeks, The Post filed a motion for a standstill order (which the Court granted) to temporarily prevent the government from searching Natanson's devices, and a motion for return of property under Federal Rule of Criminal Procedure 41(g). *Id.* ¶ 16. The Post argued

20

the seizure was an unconstitutional prior restraint. *Natanson*, 2026 WL 510727, at \*3. On February 20, at a hearing for the motion for return of property, the court admonished the government for failing to disclose the Privacy Protection Act—which imposes restrictions on seizures of press records—while pursuing the warrant for Natanson's home. *See* Latcovich Decl. ¶ 17. Then, on February 24, the court partially granted The Post and Natanson's 41(g) motion, holding that the seizure had restrained their First Amendment rights. *See id.* ¶ 18.

Just six days after the court ruled in The Post's favor and against the government—and the day before the parties were to reappear in court—Nakashima received this grand jury subpoena. Nakashima Decl. ¶ 19. "The timeline tells the story here." *Queerdoc*, 807 F. Supp. 3d at 1302.

3. *Other Evidence of Pretext.* Courts also look for any other evidence of pretext. For example, in the gender-care cases, courts found that DOJ's "thin prima facie case for its compliance with procedural requirements" suggested that the purpose of its investigation was, at the very least, "unclear." *In re Subpoena Duces Tecum No. 25-1431-016*, 2025 WL 3562151, at \*5 (W.D. Wash. Sep. 3, 2025). Similarly, the "mismatch" between DOJ's stated investigation (to investigate "manufacturers and distributors engaged in misbranding") and targeted entities' "actual operations" (only prescribing medications) "further reveal[ed] the subpoena's pretextual nature." *Queerdoc*, 807 F. Supp. 3d at 1303.

Here, several additional red flags suggest that the government's investigation is pretextual. First, the government's investigation came out of nowhere. In January, when Nakashima provided top-line information to ▓▓▓▓ about her article, there was no indication that the government even suspected that Nakashima had received classified information or that her story touched on information that a source had "reason to believe . . . [could] be used to the injury of the United States." *See* 18 U.S.C. § 793. Indeed, ▓▓▓▓ did not provide any substantive comment or

21

pushback on Nakashima's underlying reporting. Nakashima Decl. ¶¶ 15-16. ███████████

███████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████ No one from

the government asked The Post to refrain from publishing the story based on national security

grounds, such as a risk of endangering the lives of the military or other U.S. assets. *Id.* ¶ 20.

Nevertheless, seven weeks later, the government subpoenaed Nakashima, in a purported

leak investigation. *Id.* ¶ 19. Apparently, the government *suddenly* became concerned that one of

Nakashima's sources revealed information to her that "could be used to the injury of the United

States," in violation of the Espionage Act. 18 U.S.C. § 793. That beggars belief.

Second, the government departed from decades of past practice by failing to comply with

*multiple* DOJ guidelines for subpoenaing journalists. Although the DOJ recently loosened its

restrictions on serving subpoenas to reporters, the Trump Administration left several longstanding

guidelines in place. Even by the Administration's own standards, this subpoena is improper.

Pretext is more likely when the government departs from normal operations or treats similarly

situated individuals differently.[7] *E.g.*, *Gonzalez v. Trevino*, 602 U.S. 653, 655, 658 (2024).

To start, DOJ regulations direct that, before issuing a subpoena, the government should

have "reasonable grounds to believe, **based on public information, or information from sources**

**other than the member of the news media** who would be the target of the requested compulsory

process, that a crime has occurred, and that the information sought is essential to a successful

---

[7] While the DOJ guidelines provide no enforceable right themselves, the government's transparent failure to abide by their own guidelines and decision to treat Nakashima differently than other reporters, however, is evidence of pretext and harassment. In the Natanson case, the court specifically referenced these guidelines, noting that the "government's conduct has disturbed [the] baseline posture of deference" that is typically afforded government investigations. *Natanson*, 2026 WL 510727, at *6.

investigation or prosecution." 28 C.F.R. § 50.10(c)(4)(i)(A) (2025) (emphasis added). Here, however, the government subpoenaed Nakashima based solely on private communication that she—the "member of the news media who would be the target of the requested compulsory process"—sent to the government. The information that the government apparently seeks through the subpoena was never published by Nakashima or The Post.

In addition, DOJ regulations direct the government **before subpoenaing a journalist** to "pursue[] negotiations" with the journalist, "unless the Attorney General determines that such negotiations would pose a substantial threat to the integrity of the investigation, risk grave harm to national security, or present an imminent risk of death or serious bodily harm." 28 C.F.R. § 50.10(c)(4)(iii)(A). But the government never tried to negotiate with Nakashima or The Post before issuing its grand jury subpoena.[8]

DOJ's regulations also explain that law enforcement tools, like subpoenas, are to be used against "non-consenting members of the news media" only "**as extraordinary measures**, not standard investigatory practices" and "should not be used to obtain peripheral, nonessential, or speculative information." 28 C.F.R. § 50.10(a)(3), (c)(4)(i)(A) (emphasis added). But here, the government subpoenaed Nakashima over a story that never ran about an operation that already happened. There was nothing extraordinary in her reporting that would trigger the use of a grand jury subpoena for her testimony.

---

[8] It is doubtful that such negotiations "would pose a substantial threat to the integrity of the investigation, risk grave harm to national security, or present an imminent risk of death or serious bodily harm" here given that (1) Nakashima received no substantive comment or pushback on her reporting when she ran top-line information past ███████ (2) the government waited seven weeks to subpoena Nakashima after her communications with ███████ and (3) The Post never ran the story and had no imminent plan to run the story, which the government knew because Nakashima had told ███████ that she would inform ███████ if The Post were close to publication. *See* Nakashima Decl. ¶¶ 13-14.

In sum, DOJ's failure to adhere to its well-established guidelines in this case resulted in treating Nakashima differently than other reporters and therefore raises an inference of pretext.[9]

## B. The Government Issued the Subpoena To Fish for Information and Commandeer Nakashima as an "Investigative Arm of Government."

Grand juries are not "licensed to engage in arbitrary fishing expeditions," *R. Enters.*, 498 U.S. at 299, especially "where values of expression are potentially implicated," *In re Grand Jury 87-3 Subpoena Duces Tecum*, 955 F.2d 229, 234 (4th Cir. 1992). Nor is the government "free to 'annex' the news media as 'an investigative arm of government.'" *Branzburg*, 408 U.S. at 709 (Powell, J., concurring). Indeed, the Fourth Circuit has twice emphasized this requirement in its cases regarding criminal subpoenas to the press. *See Sterling*, 724 F.3d at 499 (quoting *Branzburg*, 408 U.S. at 709 (Powell, J., concurring)); *In re Shain*, 978 F.2d 850, 853 (4th Cir. 1992) (same). In other words, the government cannot compel unpublished evidence from a reporter in order to quickly obtain information that the government could obtain through its own investigation.

Communications with the government have made clear that this subpoena is nothing but a fishing expedition—precisely the kind of undisciplined prosecutorial interference with newsgathering that DOJ's guidelines are intended to prevent. Unable to begin to fathom what the testimony would concern, counsel for Nakashima asked the government what it intended to ask her. Latcovich Decl. ¶ 6. The government said that the subpoena involved a text exchange with ███████████████████████ on or about January 14, 2026, regarding ███████████ ██████ *Id.* When asked to clarify this topic, particularly given that no story was ever published, the government modified the parameters to an opaque, speculative scope, noting that they intended to ask Nakashima about ███████████████████████████████

---

[9] These are mere examples of the government's failure to follow its guidelines. There are others. *See, e.g.*, 28 C.F.R. § 50.10(a)(4)(ii) (before subpoenaing a reporter, the government should make "all reasonable attempts to obtain the information . . . from alternative sources").

███████████████████████████████ *See id.* ¶ 7; *id.*, Ex. B. There are multiple reasons why the apparent scope of testimony reveals that the government is improperly fishing for criminal activity and is seeking to commandeer Nakashima as an investigative arm to do so.

First, no article was ever published. Nakashima never published an article or made any public statement regarding the information that she sought comment on. Nakashima Decl. ¶ 18. In fact, she set aside the reporting because she did not have sufficient support for all aspects of the story she was pursuing. *Id.* Nakashima's unpublished information regarding ████████ ████████████████ are not relevant, let alone "essential," to a leak investigation. And the subpoena "should not be used to obtain peripheral, nonessential, or speculative information." 28 C.F.R. § 50.10(c)(4)(i)(A).

Second, because the government is apparently proceeding based solely off Nakashima's request for comment, it has no "reasonable grounds to believe . . . **based on information from sources other than the member of the news media who would be the target of the requested compulsory process**, that a crime has occurred." 28 C.F.R. § 50.10(c)(4)(i)(A) (emphasis added). Indeed, the government cannot "'annex' the news media as 'an investigative arm of government'" by using a reporter's request to the government for confirmation of information as the basis for a criminal investigation. *Branzburg*, 408 U.S. at 709 (Powell, J., concurring); *Sterling*, 724 F.3d at 499 (similar). Yet, again, this subpoena flies in the face of DOJ's own guidelines on issuing subpoenas to reporters. The only evidence of a leak—if any—would be Nakashima's request for comment on her potential reporting. That is not a proper basis for a grand jury subpoena to a reporter.

To be clear, the risk to journalists from a government policy that would support grand jury subpoenas in connection with *information that the press did not publish* is extraordinary. The

25

press should not be chilled from trying to publish accurate articles, or to include the government's perspective. The subpoena here turns good journalism practice on its head—seeking to punish a reporter for simply doing her job and trying to get the facts right.

Third, to the extent the government has arguably narrowed the subject to the information in Nakashima's January 2026 outreach to ▮▮▮▮ that outreach is plainly not "essential to a successful investigation or prosecution." 28 C.F.R. § 50.10(c)(4)(i)(A). The only possible criminal activity that could be implicated in this scenario is a leak of classified or national defense information. But the information that Nakashima ran past ▮▮▮▮ was largely in the public record. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

It is clear, then, that the government is not actually pursuing an essential investigation into an alleged leak of secret, national security information. This subpoena is not about a legitimate criminal investigation. Rather, the government seeks to identify individuals who might divulge information to reporters like Nakashima. The government wants Nakashima's sources.[10]

In that sense, this subpoena is consistent with the Pentagon's recent press policy held unconstitutional by a federal court. That policy prohibited the press from receiving, publishing, or soliciting information from members of the Department of Defense that those members were not authorized to share—including unclassified information. *See N.Y. Times*, 2026 WL 788689, at *10. So too here.

---

[10] As Nakashima notes, confidential sources are essential to her national security beat. Nakashima Decl. ¶ 21. She could not do her job without confidential sources who work in government.

This unprecedented subpoena is improper under Rule 17(c)(2), improper under *Branzburg*, *Sterling*, and *Shain*, and improper under the DOJ's own guidelines because its breadth reeks of a fishing expedition and an effort to use Nakashima to investigate government dissenters. It therefore must be quashed.

## II. Alternatively, a Qualified First Amendment Privilege Applies Because There is Sufficient Evidence To Question the Government's Good Faith.

There is a mountain of evidence showing the government acted with an improper purpose. This Court's analysis therefore can and should end there, and this Court should quash the subpoena under Federal Rule of Criminal Procedure 17(c)(2).

Regardless, The Post has alternatively presented sufficient evidence of bad faith to trigger this Court's obligation to "balance" the burden on Nakashima's and The Post's First Amendment rights against the government's need for the information. The Fourth Circuit has recognized that when there is "evidence . . . presented to **question** the good faith of a request for information from the press, a 'proper balance' must be struck 'between freedom of the press and the obligation of all citizens to give relevant testimony with respect to criminal conduct.'" *In re Shain*, 978 F.2d at 853 (emphasis added) (quoting *Branzburg*, 408 U.S. at 710 (Powell, J., concurring)); *see id.* (noting that "only when evidence of harassment is presented [does the Fourth Circuit] balance the interests involved").

When courts are called upon to "balance" a journalist's rights against compelled disclosure of confidential sources and the government's interests in obtaining that information, the Fourth Circuit applies a three-part test: (1) whether the information is relevant, (2) whether the information can be obtained by alternative means, and (3) whether there is a compelling interest in the information. *La Rouche v. NBC*, 780 F.2d 1134, 1139 (4th Cir. 1986). The party seeking

27

the information from the journalist bears the burden of overcoming the privilege. *In re Williams*, 766 F. Supp. 358, 369 (W.D. Pa. 1991), *order aff'd*, 963 F.2d 567 (3d Cir. 1992).

Here, application of that test favors quashing the government's subpoena.

*Relevance.* The evidence shows that the government issued this subpoena to harass Nakashima and The Post, *see supra* pp. 14-24, or, at the very least, to engage in an impermissible "fishing expedition," *supra* pp. 24-27, given that the government, ███████████████ publicly acknowledged ████████████████████████████ Because Nakashima has shown that it is unlikely that the subpoena seeks essential testimony related to a legitimate government investigation, the relevancy prong favors quashing the subpoena.

*Alternative means.* To Nakashima's knowledge, the government has not pursued *any* alternative means for obtaining the evidence it seeks. So this factor too favors quashing the subpoena. *See In re Williams*, 766 F. Supp. at 370 (quashing grand jury subpoena because government "failed to establish" that it tried "to obtain the information from other sources"); *see also* 28 C.F.R. § 50.10(c)(4)(ii).

*Compelling interest.* Not every grand jury investigation will or should outweigh a journalist's strong First Amendment interest in maintaining the confidentiality of her sources and her newsgathering materials. For multiple reasons, this investigation certainly does not.

First, where the government's investigation is not "primarily a criminal prosecution investigation," the government lacks a compelling interest to overcome the journalist's qualified privilege. *In re Grand Jury Subpoenas, No. 82-Y-22 and 82-T-23*, 1982 BL 66 (D. Colo. Feb. 19, 1982) (quashing subpoena). Here, the evidence points to the government engaging in harassment rather than pursuing a genuine criminal investigation. *Supra* pp. 14-24. The government therefore has not satisfied its burden in showing that it has a compelling interest in Nakashima's testimony.

Second, though the government will no doubt argue that it has compelling national security interests at play in this case, there is reason to doubt the government's narrative. The government has indicated that it seeks Nakashima's testimony "regarding [her] outreach ███████████ and potential reporting regarding ████████████████████████." Nakashima Decl. ¶ 19. Much of the information mentioned in her outreach was a matter of public record or Nakashima's own conjecture—not sensitive or classified national security information. *Id.* ¶¶ 7-13. The government never indicated that the points Nakashima outlined in her request for comment contained classified, much less highly sensitive national security information. *Id.* ¶¶ 15-17. The government, therefore, has at best a very limited interest in obtaining Nakashima's testimony, which cannot justify the significant "intrusion on [Nakashima's] First Amendment interests." *Ashcraft v. Conoco, Inc.*, 218 F.3d 282, 287 (4th Cir. 2000) (citing *Branzburg*, 408 U.S. at 690).

Third, the government's interest is minimal here because it is apparently seeking to compel a journalist to testify about information she *never even published. See supra* p. 25.

Fourth, the government's departure from its own guidelines required to subpoena the press underscores that its interests are illegitimate. *See supra* pp. 22-24.

Because the government's investigative interests in this case cannot overcome Nakashima's First Amendment right to not be compelled to disclose confidential sources, this Court should quash the subpoena.

III.   **Nakashima's Testimony Is Subject to a First Amendment and a Common Law Privilege.**

In *United States v. Sterling*, the Fourth Circuit agreed with *Branzburg* that "using grand jury subpoenas for purposes of "[o]fficial harassment of the press undertaken not for purposes of law enforcement but to disrupt a reporter's relationship with his news sources would have no justification." 724 F.3d 482, 494 (4th Cir. 2013) (citing *Branzburg*). To the extent the *Sterling*

29

court declined to recognize a First Amendment or common law privilege, *id.* at 492, 499, Nakashima respectfully submits that *Sterling* was wrong and preserves that argument for further appeal. *See, e.g., In re Request from the U.K.*, 718 F.3d 13, 24 (1st Cir. 2013) ("balancing of First Amendment concerns vis-à-vis the concerns asserted in favor of the compelled disclosure of academic and journalistic information is the law in this circuit for all First Amendment cases"); *United States v. Capers*, 708 F.3d 1286, 1303 (11th Cir. 2013) (recognizing "a qualified privilege for journalists . . . in both criminal and civil proceedings."); *In re Williams*, 766 F. Supp. at 370 (applying Third Circuit's federal common law privilege quash to grand jury subpoenas).

## CONCLUSION

For the reasons set forth above, this Court should quash the subpoena.

Dated: April 7, 2026

Respectfully submitted,

/s/ Simon Latcovich
Simon A. Latcovich (VSB No. 73127)
Nicholas G. Gamse (*pro hac vice* forthcoming)
Claire R. Cahill (*pro hac vice* forthcoming)
Summer G. Krasuski (*pro hac vice* forthcoming)
WILLIAMS & CONNOLLY LLP
680 Maine Avenue SW
Washington, DC 20024
Telephone: (202) 434-5000
Facsimile: (202) 480-8371
slatcovich@wc.com
ngamse@wc.com
ccahill@wc.com
skrasuski@wc.com

*Counsel for Movant Ellen Nakashima*

# CERTIFICATE OF SERVICE

I hereby certify that on April 7, 2026, I caused the foregoing document to be served upon the Assistant U.S. Attorney associated with the grand jury subpoena, Gordon D. Kromberg, by electronic mail. I further certify that on the same date, I caused a paper copy of the foregoing document to be filed with the Clerk of the Court of the Eastern District of Virginia, Alexandria Division, by hand delivery.

/s/ Simon Latcovich
Simon A. Latcovich (VSB No. 73127)

*Counsel for Movant Ellen Nakashima*

31