# EXHIBIT 9

# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF VIRGINIA
### Alexandria Division

*In re* Grand Jury Subpoena No.
25-█████████████

**FILED UNDER SEAL**

Case No. 1:26-dm-1 (WBP)

## REPLY IN SUPPORT OF ELLEN NAKASHIMA'S MOTION TO QUASH

## TABLE OF CONTENTS

INTRODUCTION .................................................................................................................1

ARGUMENT........................................................................................................................3

I.     The Subpoena Must Be Quashed Because It Serves an Improper Purpose.........................3

       A.     The Government Issued the Subpoena to Harass Nakashima and The Post............4

            1.     The Government Fails to Rebut Nakashima's Evidence of Harassment.................................................................................4

            2.     The Government is Not Entitled to the Presumption of Regularity...........11

       B.     The Government Served the Subpoena to Fish for Evidence. ...............................15

II.    Alternatively, a Qualified First Amendment Privilege Applies Because There is Evidence of Harassment. .......................................................................................15

CONCLUSION....................................................................................................................17

i

## CASES

*ABA v. DOJ*, 783 F. Supp. 3d 236 (D.D.C. 2025) ........................................................................13

*Branzburg v. Hayes*, 408 U.S. 665 (1972)................................................................................ *passim*

*Fed. Educ. Ass'n v. Trump*, 795 F. Supp. 3d 74 (D.D.C. 2025) ..................................................14

*Gonzalez v. Trevino*, 602 U.S. 653 (2024).................................................................................12

*Hueso v. Soto*, 2026 WL 539271 (D.N.J. Feb. 26, 2026) ...........................................................14

*In re 2025 UPMC Subpoena*, 2025 WL 3724705 (W.D. Pa. Dec. 24, 2025)...........................5, 13

*In re Administrative Subpoena No. 25-1431-019*, 800 F. Supp. 3d 229 (D. Mass. 2025)............14

*In re Children's Nat'l Hosp.*, 2026 WL 160792 (D. Md. Jan. 21, 2026) .......................................13

*In re DOJ Administrative Subpoena No. 25-1431-030*,
    2026 WL 33398 (D. Colo. Jan. 5, 2026).............................................................................13

*In re Grand Jury 87-3 Subpoena Duces Tecum*, 955 F.2d 229 (4th Cir. 1992) ..............................3

*In re Grand Jury Subpoena*, 175 F.3d 332 (4th Cir. 1999) .......................................................5, 7

*In re Grand Jury Subpoenas*, --- F. Supp. 3d ----,
    2026 WL 710202 (D.D.C. Mar. 13, 2026)................................................................2, 5, 7, 13

*In re Request from the U.K.*, 718 F.3d 13 (1st Cir. 2013).............................................................17

*In re Search of Real Prop. & Premises of Hannah Natanson*,
    2026 WL 510727 (E.D. Va. Feb. 24, 2026)......................................................................13, 14

*In re Shain*, 978 F.2d 850 (4th Cir. 1992)............................................................................16, 17

*In re Subpoena Duces Tecum No. 25-1431-016*,
    2025 WL 3562151 (W.D. Wash. Sep. 3, 2025)........................................................................5

*In re Subpoena No. 25-1431-014*, 810 F. Supp. 3d 555 (E.D. Pa. 2025) ....................................13

*In re Williams*, 766 F. Supp. 358 (W.D. Pa. 1991),
    *order aff'd*, 963 F.2d 567 (3d Cir. 1992).........................................................................16, 17

*Kelly v. Hegseth*, 2026 WL 391777 (D.D.C. Feb. 12, 2026)........................................................13

*LaRouche v. NBC*, 780 F.2d 1134 (4th Cir. 1986)......................................................................16

*Media Matters for Am. v. FTC*, 805 F. Supp. 3d 105 (D.D.C. 2025) ...............................2, 5, 7, 13

*N.Y. Times Co. v. DOD*, No. 26-5113 (D.C. Cir. Apr. 27, 2026) ....................................................10

*N.Y. Times v. DOD*, --- F. Supp. 3d ----,
    2026 WL 788689 (D.D.C. Mar. 20, 2026)........................................................................10, 13

*Perkins Coie LLP v. DOJ*, 783 F. Supp. 3d 105 (D.D.C. 2025)........................................7, 13

*President & Fellows of Harvard Coll. v. DHS*,
    788 F. Supp. 3d 182 (D. Mass. 2025) ......................................................................11, 13

*QueerDoc, PLLC v. DOJ*, 807 F. Supp. 3d 1295 (W.D. Wash. 2025) ...............................2, 5, 7, 14

*Singh v. Tsoukaris*, No. 26-cv-01531 (D.N.J., Feb. 20, 2026)......................................14

*United States v. R. Enters., Inc.*, 498 U.S. 292 (1991)......................................3, 11, 15

*United States v. Capers*, 708 F.3d 1286 (11th Cir. 2013)......................................17

*United States v. Comey*, 809 F. Supp. 3d 396 (E.D. Va. 2025) ......................................11, 14

*United States v. McTague*, 840 F.3d 184 (4th Cir. 2016) ......................................8

*United States v. Oregon*, --- F. Supp. 3d ----,
    2026 WL 318402 (D. Or. Feb. 5, 2026)......................................14

*United States v. Sterling*, 724 F.3d 482 (2013)......................................15, 17

*Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252 (1977) ......................................12

*Wilmer Cutler Pickering Hale and Dorr LLP v. Exec. Off. of the President*,
    774 F. Supp. 3d 86 (D.D.C. 2025)......................................13

## RULES AND REGULATIONS

28 C.F.R. § 50.10 (2025) ......................................6, 12, 15

Federal Rule of Criminal Procedure 17(c)(2) ......................................3, 11

## INTRODUCTION

The government's opposition confirms what The Post's motion established: this grand jury subpoena should be quashed. The subpoena is the latest chapter in this Administration's sustained campaign to harass, intimidate, and silence Ellen Nakashima—a three-time Pulitzer Prize-winning national security reporter—and The Washington Post. The government does not meaningfully contest the mountain of evidence demonstrating that the government acted with an improper purpose. Instead, the government asks this Court to look the other way, under the cover of the presumption of regularity. But the evidence overwhelmingly shows that this is no regular case; the government's subpoena is an exceptional assault on a disfavored journalist's reporting and the government is entitled to no such deference.

The government's principal arguments are telling for what they do not say. The government never actually denies that this Administration has targeted Nakashima and The Post. It does not dispute the litany of inflammatory public statements by senior officials—from the President's confidante Roger Stone asking "[w]hy isn't this b!tch in jail?" to the Director of National Intelligence Tulsi Gabbard accusing Nakashima of writing "complete bullshit," to the White House naming her "Media Offender of the Week."[1] It does not dispute that █████ and ████████████ did not express any national security concerns to Nakashima when she contacted them for comment—instead, it reveals that ██████████████████ made "the determination that the disclosure of information contained in Nakashima's Signal messages risked causing exceptionally grave harm" to national security weeks *after* Nakashima reached out on Signal for

---

[1] Stone is an important and influential advisor to the President with influence over key decisions in the Administration. Earlier this month, Stone confirmed that he convinced President Trump not to fire Gabbard. *See, e.g.,* Roger Stone (@RogerJStoneJr), X (Apr. 9, at 13:32 ET), https://x.com/RogerJStoneJr/status/2042294545417752746.

1

comment. It does not dispute that Nakashima and The Post never even published an article based on the reporting inquiry that supposedly triggered the subpoena. It does not dispute that the government failed to comply with multiple DOJ regulations designed to prevent precisely this kind of abuse of the press.

Rather than engaging with this evidence, the government retreats to generalities. It insists that Nakashima has "no special privilege" to resist a grand jury subpoena—ignoring that the Supreme Court itself has cautioned that "[o]fficial harassment of the press undertaken not for purposes of law enforcement but to disrupt a reporter's relationship with his news sources" has "no justification." *Branzburg v. Hayes*, 408 U.S. 665, 707-08 (1972). It invokes the presumption of regularity—even as courts across the country have refused to extend that presumption to this Administration's conduct, and even where it failed to follow its own guidelines for subpoenaing journalists in this case. It claims granting Nakashima immunity proves good faith—even though the harm the government seeks to inflict is not prosecution of Nakashima, but the destruction of her confidential source relationships that are essential to her reporting. And it quibbles with the timing of the subpoena by disclosing that it issued the subpoena "a week before the hearing on Natanson's [Rule 41(g)] motion"—which, far from helping the government, shows the government still issued the subpoena shortly after this Court's standstill order stopped prosecutors from poring through a Post reporter's devices in the *Natanson* case.

The evidence of harassment, taken as a whole, is overwhelming—and it mirrors the evidence that other courts have relied upon to quash subpoenas issued by this very Administration in other cases. *See, e.g., In re Grand Jury Subpoenas*, --- F. Supp. 3d ----, 2026 WL 710202, at *8-10 (D.D.C. Mar. 13, 2026) ("*Powell*") (grand jury subpoena); *QueerDoc, PLLC v. DOJ*, 807 F. Supp. 3d 1295, 1301-03 (W.D. Wash. 2025) (administrative subpoena); *see also Media Matters*

*for Am. v. FTC*, 805 F. Supp. 3d 105, 133-37 (D.D.C. 2025) (civil investigative demand); Mot. at 15 & n.5 (collecting cases). The government does not even attempt to distinguish those decisions. This Court should reach the same conclusion here: the subpoena's sole or dominant purpose is to harass Nakashima and The Post, to chill Nakashima's sources, and to punish her for national security reporting the Administration does not like. This subpoena must be quashed under Federal Rule of Criminal Procedure 17(c)(2) and the First Amendment.

## ARGUMENT

### I.    The Subpoena Must Be Quashed Because It Serves an Improper Purpose.

This Court should quash the government's unreasonable grand jury subpoena under Federal Rule of Criminal Procedure 17(c)(2) because The Post has demonstrated that the subpoena was issued to harass Nakashima and The Post.

The government maintains that Nakashima has "no special privilege" as a journalist to avoid "responding to valid legal process issued in aid of a criminal investigation." Opp. at 6. That is wrong, *see infra* pp. 16-17, but also beside the point. Here, Nakashima is seeking the same protection afforded to *any* citizen: to be free from a grand jury subpoena issued "out of malice or an intent to harass" or as part of an "arbitrary fishing expedition[]." *United States v. R. Enters., Inc.*, 498 U.S. 292, 299 (1991). Journalists are certainly not excluded from this protection. To the contrary, the Supreme Court has warned that use of a grand jury subpoena for "harassment of the press" has "no justification." *Branzburg*, 408 U.S. at 707-08. And, in a case that the government entirely ignores, the Fourth Circuit has held that when, as here, a grand jury subpoena implicates "values of expression," courts must scrutinize "with special sensitivity" whether the government is engaging in "fishing expeditions" or has "select[ed] targets of investigation out of malice or an intent to harass." *In re Grand Jury 87-3 Subpoena Duces Tecum*, 955 F.2d 229, 234 (4th Cir. 1992) (citation omitted). Given the significant evidence that the government has targeted

3

Nakashima and The Post with this subpoena primarily for the improper purpose of interfering with their expression, this Court should quash the subpoena.

### A.  The Government Issued the Subpoena to Harass Nakashima and The Post.

The government's purpose here is unmistakable. The evidence—most of which the government does not even try to refute—demonstrates that the government's primary purpose in issuing this subpoena is not to investigate a leak of information that could "cause exceptionally grave damage to national security." *Contra* Opp. at 6. This subpoena seeks to compel Nakashima's testimony regarding an article that was never published, about ██████████

████████████████████████████████████

███████████████ and about which the government raised no national security concerns when Nakashima asked. This leak investigation is a pretext to harass a reporter for doing her job and to punish The Post for Pentagon coverage the Administration dislikes. The Trump Administration saw an opportunity to sideline a reporter who it has viewed as a thorn in its side for years and it took it, without bothering to follow its own regulations governing the collection of information from the media.

#### 1.  The Government Fails to Rebut Nakashima's Evidence of Harassment.

The fact that this subpoena has the dominant purpose of harassing Nakashima and The Post is not, as the government argues, "[m]ere conjecture and speculation about the government's motives." *Contra* Opp. at 8. Rather, The Post has produced concrete evidence from this Administration's own expansive comments establishing that it wanted to silence Nakashima, to interfere with her relationships with her national security sources, and to discredit The Post and its national security reporters. Mot. at 4-10. And other evidence—the timing of the subpoena, the government's failure to adhere to its own regulations, the government's changed position regarding whether the information Nakashima inquired about implicated national security

4

concerns—all demonstrate that the government issued the subpoena to harass a disfavored reporter, not for the dominant purpose of pursuing a criminal investigation.

The Post need not produce a smoking gun (like an explicit admission from the Administration that this subpoena was issued for harassment purposes) for this Court to quash the subpoena. Such evidence would be a rarity—particularly in the context of highly secretive grand jury proceedings. Courts, including within the Fourth Circuit, therefore look to the very same kind of evidence that The Post has produced here: evidence "raising the inference" that the subpoena has been issued for an improper purpose. *See In re Grand Jury Subpoena*, 175 F.3d 332, 337-38 (4th Cir. 1999) (affirming quashing of grand jury subpoena); *Powell*, 2026 WL 710202, at *8 (similar). Indeed, as The Post explained in its motion, courts around the country have quashed this Administration's subpoenas—including a recent grand jury subpoena—based on very similar evidence to what The Post produced here. *See* Mot. at 15-21; *see, e.g., Powell*, 2026 WL 710202, at *8-9; *QueerDoc*, 807 F. Supp. 3d at 1301-03; *In re 2025 UPMC Subpoena*, 2025 WL 3724705, at *2 (W.D. Pa. Dec. 24, 2025); *In re Subpoena Duces Tecum No. 25-1431-016*, 2025 WL 3562151, at *5, 10-12 (W.D. Wash. Sep. 3, 2025); *see also Media Matters*, 805 F. Supp. 3d at 119, 134-37 (civil investigative demand). The government makes no effort to distinguish those cases; it does not even cite them in its opposition.

The government also does not even try to rebut the bulk of The Post's evidence that this grand jury subpoena was issued for an improper purpose. Most importantly, the government *never actually denies that the Administration targeted Nakashima and The Post in this investigation—* only that The Post supposedly does not have enough evidence to prove targeting. Nor does the government deny:

1. That public comments by members of this Administration and the President's advisors reflect that the Administration has engaged in an intimidation campaign against Nakashima and The Post. Latcovich Decl. ¶¶ 8-14.

2. That the Trump Administration has used unusual investigation tactics against Post reporters, including authorizing a no-notice subpoena for phone records and information from email accounts used by three Post reporters (including Nakashima specifically) during the first Trump Administration and, during the second Trump Administration, conducting a search of a Post reporter's home, without identifying and analyzing in the search warrant application to the Court the protections afforded journalists under the Privacy Protection Act. *Id.* ¶ 13.

3. That this Administration has taken concrete steps to silence journalists through threats, policies, and unprecedented legal processes that punish the press for disfavored reporting, particularly as it relates to national security and foreign policy. *Id.* ¶¶ 20-25.

4. That when Nakashima reached out to ███████ and ████████████ about her article, the government provided no pushback on Nakashima's underlying reporting and never communicated that her information could jeopardize national security. Nakashima Decl. ¶¶ 15-16.

5. That no one from the government asked The Post to refrain from publishing Nakashima's story based on national security grounds, such as a risk of endangering the lives of the military or other U.S. assets. *Id.* ¶ 20.

6. That ████████████████ was already public knowledge ████████████████████ ████████████████████████████████ *id.* ¶ 10, or that, prior to Nakashima's inquiry, ████████████████████████████████████████ ████████████████████████████████████████ ████████████████████████████████████

7. That the Post never published the article or the information at issue in Nakashima's request for comment. *Id.* ¶¶ 13-14, 18.

8. That before issuing the subpoena to Nakashima, the government did not comply with multiple requirements in the DOJ regulations for issuing subpoenas to journalists, including that it did not:

   a. Try to "pursue[] negotiations" with Nakashima before issuing the subpoena, 28 C.F.R. § 50.10(c)(4)(iii)(A) (2025);

   b. Have "reasonable grounds to believe, based on public information, or information from sources other than the member of the news media who would be the target of the requested compulsory process, that a crime has occurred, and that the information sought is essential to a successful investigation or prosecution," *id* § 50.10(c)(4)(i)(A);

   c. Make "all reasonable attempts to obtain the information . . . from alternative sources" *before* subpoenaing Nakashima, *id.* § 50.10(a)(4)(ii).

9. That the government's failure to comply with DOJ guidelines for subpoenaing journalists is a departure from decades of past practice. Mot. at 22.

6

These unrebutted facts, "taken as a whole," provide overwhelming evidence of the government's improper purpose in issuing the subpoena. *See In re Grand Jury Subpoena*, 175 F.3d at 338 (affirming decision to quash grand jury subpoena where the evidence "as a whole" demonstrated the government's improper purpose). The Administration's own comments are strong evidence that the Administration harbored animus toward The Post and national security reporters generally and Nakashima specifically. *See e.g.*, *Powell*, 2026 WL 710202, at *1 (citing President's and deputies' social media posts as "abundant evidence that the [grand jury] subpoenas' dominant (if not sole) purpose is to harass and pressure [Federal Reserve Chair] Powell"); *Media Matters*, 805 F. Supp. 3d at 135 (social media posts criticizing Media Matters in ideological terms were "precisely the sorts of comments that courts in this District have considered as evidence of retaliatory intent"); *QueerDoc*, 807 F. Supp. 3d at 1303 ("No clearer evidence of [administrative subpoena's] improper purpose could exist than the Government's own repeated declarations that it seeks to end the very practice it claims to be merely investigating."); *see also, e.g.*, *Perkins Coie LLP v. DOJ*, 783 F. Supp. 3d 105, 162 (D.D.C. 2025) ("President Trump's repeated prior statements about plaintiff and lawyers formerly associated with the [plaintiff] Firm provide probative context that informs assessment of the retaliatory purpose of the [challenged] Order as a whole.").

But the Administration's public comments are far from the *only* evidence of improper purpose. This might be a different case if, despite the Administration's public comments disparaging Nakashima and The Post, the government had abided by DOJ's regulations, if it had told a consistent story regarding whether Nakashima's information posed a threat to national security, if the subpoena had not been issued during the government's ongoing legal battle with The Post, or if it had not recently engaged in other unprecedented legal processes that punish the

press for disfavored reporting. But in this case, where there is evidence of the Administration's animus paired with other evidence of pretext, the Post has shown that the subpoena was issued for an improper purpose.

The government (at 10-11) pushes back only on *one* element of *one* fact cited in The Post's entire submission: the suspect timing of the grand jury subpoena. As The Post explained in its motion, Nakashima reached out to ▮▮▮▮▮▮▮ and ▮▮▮▮ for comment in mid-January 2026 and was not told that any of her information would cause "exceptionally grave harm" to the United States if disclosed. Nakashima Decl. ¶ 12. About the same time, the government raided Hannah Natanson's home and seized her devices. Latcovich Decl. ¶ 15. Between January 21 and February 24, the government suffered several setbacks in its efforts to search Natanson's devices, including a standstill order issued by this Court on January 21 preventing the government from searching the devices, followed on February 24 by a partial grant of The Post's Rule 41(g) motion, holding that the seizure had restrained their First Amendment rights. Latcovich Decl. ¶¶ 15-18.

The government contests none of these facts. Instead, it merely urges that The Post is drawing the wrong inferences from that timing because the government actually started the process of subpoenaing Nakashima on February 9, before the Court granted The Post's Rule 41(g) motion. Opp. at 10. That fact, the government says, undermines The Post's argument that the government was responding in "frustration" to "being thwarted in its attempts to search the property of another Washington Post reporter." Opp. at 9.

To start, even if the government's supplemented timeline showed that the timing of the subpoena to Nakashima was innocent, The Post still has more than enough evidence to show harassment. The "timing of events" is "*one* factor a district court considers in deciding whether sufficient prosecutorial misconduct exists to justify quashing a grand jury subpoena." *United*

8

*States v. McTague*, 840 F.3d 184, 192 (4th Cir. 2016) (emphasis added). It is not, by any means, the only or even the most significant evidence suggesting this subpoena was issued primarily for an improper purpose. However, the government's timeline also does not compromise The Post's argument that the timing suggests that the government acted with an improper purpose. Even under the timeline the government now discloses, the government initiated this grand jury subpoena *only after* the government's attempt to search Natanson's files was stopped in its tracks by the Court's January 21 standstill order. The government offers no explanation for why it decided to start the process of subpoenaing Nakashima when it did. Nor does it explain why the Department of War only "made" a "determination . . . that the disclosure of information contained in Nakashima's Signal messages risked causing exceptionally grave harm . . . *11 days before the [Natanson] hearing*" on February 9—nearly a month after Nakashima had initially reached out to ████████████████████████ and after the government had already responded to Nakashima and raised no national security concerns. Opp. at 10.

Having failed to rebut any of The Post's evidence that this subpoena was issued for the purpose of harassment, the government offers a smattering of reasons why the subpoena should not be quashed. None is persuasive.

The government (at 8) contends that "the fact that the Department of Justice requested and obtained immunity for Nakashima" is affirmative evidence that "the subpoena was for a legitimate purpose," not to harass Nakashima. The government's argument implies that the only form of harassment from which Nakashima is protected is that of improper prosecution. But the Supreme Court in *Branzburg* was not concerned that the government would use grand jury subpoenas to prosecute journalists; it was concerned that the government may issue subpoenas "to disrupt a reporter's relationship with his news sources." *Branzburg*, 408 U.S. at 707-08. That is precisely

9

the form of harassment that is occurring here. Mot. at 6, 26 & n.10. The Trump Administration has made clear that it wants to prohibit members of the press and Nakashima herself from speaking to government sources about any information, whether classified or not. Indeed, that is exactly what the Pentagon attempted to do last year when it adopted an unconstitutional policy prohibiting the press from receiving, publishing, or soliciting information from members of the Department of Defense that those members were not authorized to share—including unclassified information. *See N.Y. Times Co. v. DOD*, --- F. Supp. 3d ----, 2026 WL 788689, at *5, 10 (D.D.C. Mar. 20, 2026).[2] The grant of immunity from criminal prosecution does not in any way ameliorate the harm that the government is trying to inflict: disrupting Nakashima's relationship with her sources.

The government (at 6-7) offhandedly minimizes any concern that the subpoena will chill Nakashima's sources because "*Branzburg* dismissed" concerns about "chilling effects that could result from requests for information about confidential sources." But while *Branzburg* noted uncertainty about whether confidential sources would, in general, be chilled by reporters receiving grand jury subpoenas, it also instructed that the government could not issue a grand jury subpoena "for *purposes* of . . . disrupt[ing] a reporter's relationship with his news sources"—which is precisely what the government is doing here. 408 U.S. at 707-08 (emphasis added). There is, according to the Supreme Court, "no justification" for issuing a grand jury subpoena with that purpose, regardless of whether that intended effect is likely to succeed. *Id.*

---

[2] The government successfully moved for an emergency stay of a "very limited" part of the district court's injunction enforcing the summary-judgment ruling—a part which had prevented the government from requiring officials to escort journalists inside the Pentagon. *See N.Y. Times Co. v. DOD*, No. 26-5113, at 3 (D.C. Cir. Apr. 27, 2026). The D.C. Circuit reasoned that "the challenged 2025 policy" did not "comtemplat[e]" the new escort rule, which was "not address[ed]" by the "district court's . . . summary judgment opinion and order." *Id.* at 4. Notably, the government did not ask for, and the court did not grant, a stay permitting the government to implement any other aspect of the policies restricting journalists' Pentagon access.

10

The government (at 11-12) also suggests that if this Court finds—based on the Administration's multitude of social media posts and public statements ridiculing Nakashima and The Post—that the government intended to harass Nakashima, Nakashima would essentially be provided "with immunity from having to testify before any grand jury for any reason for the life of this Presidential administration." Not so. The Court need not decide whether this Administration's well-documented animosity toward Nakashima and The Post could, standing alone, justify quashing an otherwise legitimate subpoena under Rule 17(c)(2). Here, the Administration's animosity, while compelling evidence of harassment, is accompanied by evidence of pretext *beyond* the fact that the subpoena was issued to a disfavored reporter working for a disfavored media outlet.

## 2.   The Government is Not Entitled to the Presumption of Regularity.

Facing pages upon pages of evidence that indicate that this Administration issued this subpoena out of malice or an intent to harass Nakashima and The Post, the government falls back on the presumption of regularity typically afforded to grand jury proceedings. *See R. Enters.*, 498 U.S. at 300-01; Opp. at 7. But courts "will not apply any presumption of regularity to conduct that is so unusual and therefore irregular on its face." *President & Fellows of Harvard Coll. v. DHS*, 788 F. Supp. 3d 182, 205 (D. Mass. 2025); *see also United States v. Comey*, 809 F. Supp. 3d 396, 410 (E.D. Va. 2025) (an "unusual series of events . . . calls into question the presumption of regularity generally associated with grand jury proceedings"). The government's conduct both in this case and in recent action taken against The Post are highly irregular. The government is thus not entitled to the presumption of regularity here.

First, it is notable that the government is invoking the presumption of regularity in a case where it apparently concedes that it violated its own regulations, despite generally adhering to those policies for decades. As The Post's motion explained—and the government does not

11

dispute—the government failed to "pursue[] negotiations" with Nakashima before issuing the subpoena, 28 C.F.R. § 50.10(c)(4)(iii)(A), lacked "reasonable grounds to believe, based on" a source other than Nakashima "that a crime has occurred, and that the information sought is essential to a successful investigation or prosecution," *id.* § 50.10(c)(4)(i)(A), issued a subpoena without exhausting other means of investigating the alleged crime, *id.* § 50.10(a)(4)(ii), and used a subpoena against a "non-consenting" journalist absent "extraordinary" circumstances," *id.* § 50.10(a)(3). The government insists that it followed its regulations in *one* respect by receiving permission from the Attorney General to issue the subpoena (and Nakashima never claimed otherwise). Opp. at 9 n.4. But the government's silence as to the other regulations cited above appears to be an explicit admission that it did not, in fact, comply with *those* requirements. The government is entitled to no presumption of regularity where it has, as here, failed to adhere to its own rules and regulations. As the Supreme Court has explained, "[d]epartures from the normal procedural sequence might afford evidence that improper purposes are playing a role" in government decisionmaking. *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 267 (1977); *see also Gonzalez v. Trevino*, 602 U.S. 653, 658 (2024) (recognizing that a departure from consistent practice can be evidence of First Amendment retaliation).

Second, the government is entitled to no presumption of regularity where its irregular conduct in this case follows closely on the heels of its other irregular conduct in proceedings with The Post. In *Natanson*, where the government engaged in an unprecedented search of a Post reporter's home and seized her newsgathering materials, this very Court found that the government had forfeited the presumption of regularity when it failed to disclose relevant authority to the Court in pursuit of its search warrant. The "government's conduct" in that proceeding "disturbed that

12

baseline posture of deference." *In re Search of Real Prop. & Premises of Hannah Natanson* ("*Natanson*"), 2026 WL 510727, at *6 (E.D. Va. Feb. 24, 2026).

Finally, this Administration is entitled to no presumption of regularity where it has proven itself again and again to be fully capable of the retaliatory conduct alleged and established here. This Administration has not hesitated to use executive power to retaliate against its perceived political opponents for their exercise of their First Amendment rights, as courts have repeatedly recognized. *E.g.*, *Kelly v. Hegseth*, --- F. Supp. 3d 2026 WL 391777, at *1 (D.D.C. Feb. 12, 2026) (enjoining retaliation against retired naval officer for voicing certain opinions on military actions and policy); *Wilmer Cutler Pickering Hale and Dorr LLP v. Exec. Off. of the President*, 774 F. Supp. 3d 86, 88 (D.D.C. 2025) (enjoining "retaliatory" Executive Order against law firm); *President & Fellows of Harvard Coll.*, 788 F. Supp. 3d at 186 (enjoining retaliatory conduct directed at Harvard for its exercise of its First Amendment rights); *Perkins Coie*, 783 F. Supp. 3d at 157 (enjoining Executive Order issued in "retaliation for [law firm's] First Amendment protected activity"); *ABA v. DOJ*, 783 F. Supp. 3d 236, 246 (D.D.C. 2025) (enjoining government's termination of grants to ABA in retaliation for ABA engaging in protected speech); *N.Y. Times*, 2026 WL 788689, at *14 ("[T]he undisputed evidence reflects the Policy's true purpose and practical effect: to weed out disfavored journalists . . . and replace them with news entities that are. That is viewpoint discrimination, full stop.").

And, even in the last year, it has repeatedly and infamously used its subpoena powers to target entities and individuals that the Administration dislikes. *Powell*, 2026 WL 710202, at *1; *Media Matters*, 805 F. Supp. 3d at 119; *In re Children's Nat'l Hosp.*, 2026 WL 160792, at *8 (D. Md. Jan. 21, 2026); *In re DOJ Administrative Subpoena No. 25-1431-030*, 2026 WL 33398, at *7 (D. Colo. Jan. 5, 2026); *In re 2025 UPMC Subpoena*, 2025 WL 3724705, at *1; *In re Subpoena*

13

*No. 25-1431-014*, 810 F. Supp. 3d 555, 577 & n.109 (E.D. Pa. 2025); *QueerDoc*, 807 F. Supp. 3d at 1304; *In re Administrative Subpoena No. 25-1431-019*, 800 F. Supp. 3d 229, 239 (D. Mass. 2025).

This Administration's conduct has thus led federal courts across the country to refuse to apply the presumption of regularity to this Administration's conduct in a wide range of cases, including in this courthouse. *See e.g., Comey*, 809 F. Supp. 3d at 410; *Natanson*, 2026 WL 510727, at *6; *see also, e.g., Fed. Educ. Ass'n v. Trump*, 795 F. Supp. 3d 74, 90 (D.D.C. 2025) ("In just six months, the President of the United States may have forfeited the right to such a presumption of regularity."); *United States v. Oregon*, --- F. Supp. 3d ----, 2026 WL 318402, at *11 (D. Or. Feb. 5, 2026) ("The presumption of regularity that has been previously extended to Plaintiff that it could be taken at its word—with little doubt about its intentions and stated purposes—no longer holds."); *Singh v. Tsoukaris*, No. 26-cv-01531 (D.N.J., Feb. 20, 2026) ("[T]he presumption of regularity and integrity previously and routinely afforded to the Executive branch and the United States Attorney's Office has been undeniably eroded in this jurisdiction and across the country."); *Hueso v. Soto*, 2026 WL 539271, at *3 (D.N.J. Feb. 26, 2026) ("Sadly, the well-deserved credibility once attached to that distinguished [U.S. Attorney's] Office is now a presumption that has been undeniably eroded." (citation omitted)) .

The government's ongoing efforts to harass, intimidate, and silence Nakashima and The Post defeat whatever remains of this Administration's presumption of regularity. Nothing about the Administration's behavior with respect to Nakashima or this subpoena is typical—not the barrage of social media posts from top government officials aimed at one journalist, the formal anti-press policies, the subpoena based on an unpublished article, the blatantly pretextual leak investigation, or the contravention of DOJ guidelines.

14

**B.    The Government Served the Subpoena to Fish for Evidence.**

"Grand juries are not licensed to engage in arbitrary fishing expeditions," *R. Enters.*, 498 U.S. at 299, and the government cannot "'annex' the news media as 'an investigative arm of government'" by using a reporter's request to the government for confirmation of information as the basis for a criminal investigation, *Branzburg*, 408 U.S. at 709 (Powell, J., concurring); *United States v. Sterling*, 724 F.3d 482, 499 (2013) (similar).

The hallmarks of a fishing expedition are present here.  The government does not contest that no article with information about the alleged leak was ever published, so presumably the government found out about it from Nakashima when she reached out for comment.  But the government is not supposed to issue a subpoena to a reporter when the government has no "reasonable grounds to believe, based on . . . information from sources *other than the member of the news media who would be the target of the requested compulsory process*, that a crime has occurred." 28 C.F.R. § 50.10(c)(4)(i)(A) (emphasis added).  Doing so commandeers the reporter as "an investigative arm of government"—exactly what *Branzburg* and *Sterling* prohibit.  Here, Nakashima did not reach out to the government to willingly offer evidence of a leak.  Consistent with standard journalistic practice, she reached out in mid-January only to verify her potential reporting about ███████████████████████████.  The government is now trying to shoehorn Nakashima's ordinary journalistic outreach into some sort of criminal investigation in an effort to fish for information about potential government sources.  The Court should not permit such conduct.

**II.    Alternatively, a Qualified First Amendment Privilege Applies Because There is Evidence of Harassment.**

This Court should, in the alternative, quash the subpoena under Nakashima's qualified First Amendment privilege.  Contrary to the government's assertion, the Fourth Circuit has not

categorically rejected a qualified reporter's privilege for *all* grand jury subpoenas in criminal cases. Instead, in a case the government (again) entirely ignores, the Fourth Circuit has held that when there is "evidence [] presented to *question* the good faith of a request for information from the press, a 'proper balance' must be struck 'between freedom of the press and the obligation of all citizens to give relevant testimony with respect to criminal conduct.'" *In re Shain*, 978 F.2d 850, 853 (4th Cir. 1992) (quoting *Branzburg*, 408 U.S. at 710 (Powell, J., concurring)) (emphasis added); *see id.* (noting that "only when evidence of harassment is presented [does the Fourth Circuit] balance the interests involved"). Nakashima has certainly presented evidence to *question* the government's good faith here. It is therefore the *government's* burden to overcome the privilege by showing that the evidence it seeks from Nakashima (1) is relevant and (2) cannot be obtained by alternative means, and that the government has (3) a compelling interest in the information. *LaRouche v. NBC*, 780 F.2d 1134, 1139 (4th Cir. 1986); *In re Williams*, 766 F. Supp. 358, 369 (W.D. Pa. 1991) (party seeking information bears the burden of overcoming privilege), *order aff'd*, 963 F.2d 567 (3d Cir. 1992).

Because the government never reckons with *In re Shain* and denies that any qualified privilege exists, it makes no attempt to respond to The Post's argument that the government cannot overcome Nakashima's qualified privilege. Mot. at 28-29. Nowhere in its brief does the government assert, as it must to overcome the privilege, that it has pursued *any* alternative means of obtaining the evidence it seeks. Mot. at 28. To the extent that it elsewhere asserts in its opposition that "the information demanded by the subpoena is relevant to the grand jury's investigation," The Post's evidence of improper purpose undercuts that assertion. *See supra* pp. 3-15; Mot. at 28. And there are significant reasons to doubt that the government's national security

16

concerns are legitimate. Mot. at 28-29; *supra* pp. 3-15. The government therefore has not carried its burden to overcome Nakashima's First Amendment privilege.[3]

## CONCLUSION

For the reasons stated above and in Movant's opening brief, this Court should quash the subpoena.

Dated: May 1, 2026            Respectfully submitted,

/s/   Simon A. Latcovich
Simon A. Latcovich (VSB No. 73127)
Nicholas G. Gamse (*pro hac vice pending*)
Claire R. Cahill (*pro hac vice pending*)
Summer G. Krasuski (*pro hac vice pending*)
WILLIAMS & CONNOLLY LLP
680 Maine Avenue SW
Washington, DC 20024
Telephone: (202) 434-5000
Facsimile: (202) 480-8371
slatcovich@wc.com
ngamse@wc.com
ccahill@wc.com
skrasuski@wc.com

*Counsel for Movant Ellen Nakashima*

---

[3] The government (at 2-7) spends much of its brief defending a question that The Post acknowledges is for the Fourth Circuit (not this Court) to consider: whether *Sterling* was wrongly decided when it declined to recognize a First Amendment or common law privilege in circumstances where there is no evidence of harassment or improper purpose and the testimony is relevant. Mot. at 29-30. The government (at 3), however, is wrong that the Supreme Court in *Branzburg* completely "rejected claims of privilege by reporters who have been called to testify before a grand jury about criminal conduct involving confidential sources." To the contrary, other Circuits have held, post-*Branzburg*, that the First Amendment and/or the common law create a qualified privilege for journalists that applies in criminal proceedings. *See, e.g., In re Request from the U.K.*, 718 F.3d 13, 24 (1st Cir. 2013); *United States v. Capers*, 708 F.3d 1286, 1303 (11th Cir. 2013); *In re Williams*, 766 F. Supp. at 370 (applying Third Circuit's federal common law privilege quash to grand jury subpoenas).

17

## CERTIFICATE OF SERVICE

I hereby certify that on May 1, 2026, I caused the foregoing document to be served upon the Assistant U.S. Attorney associated with the grand jury subpoena, Gordon D. Kromberg, by electronic mail. I further certify that on the same date, I caused a paper copy of the foregoing document to be filed with the Clerk of the Court of the Eastern District of Virginia, Alexandria Division, by hand delivery.

/s/  Simon A. Latcovich
Simon A. Latcovich (VSB No. 73127)

*Counsel for Movant Ellen Nakashima*

18