# EXHIBIT 10

1

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION

```
-------------------------------x
                               :
UNITED STATES OF AMERICA       : CRIMINAL NO:
                               : 26-dm-1
                               :
        v.                     :
                               :
UNDER SEAL,                    : May 22, 2026
                               :
                               : UNDER SEAL
-------------------------------x
```

TRANSCRIPT OF GRAND JURY SUBPOENA
BEFORE THE HONORABLE WILLIAM PORTER,
UNITED STATES DISTRICT COURT MAGISTRATE JUDGE

A P P E A R A N C E S

FOR THE GOVERNMENT:     GORDON KROMBERG, DOJ
                        United States Attorneys Office
                        2100 Jamieson Avenue
                        Alexandria, VA 22314

FOR THE DEFENDANT:      SIMON LATCOVICH, ESQ.
                        NICHOLAS G. GAMSE, ESQ.
                        Williams & Connolly LLP
                        680 Maine Avenue SW
                        Washington, DC 20024

OFFICIAL U.S. COURT REPORTER:     MS. TONIA M. HARRIS, RPR
                        United States District Court
                        401 Courthouse Square
                        Tenth Floor
                        Alexandria, VA 22314

Tonia M. Harris OCR-USDC/EDVA 703-646-1438

EASTERN DISTRICT OF VIRGINIA

—***UNDER SEAL***—

2

## P R O C E E D I N G S

(Court proceedings commenced at 11:19 a.m.)

THE COURTROOM CLERK:  Calling 26-dm-1.  Under seal matter.

MR. KROMBERG:  Good morning, Your Honor.  Gordon Kromberg for the United States.

THE COURT:  Good morning, Mr. Kromberg.

MR. LATCOVICH:  Good morning, Your Honor.  Simon Latcovich and Nicholas Gamse for Ms. Nakashima.

THE COURT:  I see we have other folks in the courtroom.  I know this is a sealed matter.  Are we good with everyone's appearance?

MR. KROMBERG:  Yes, Your Honor.

MR. LATCOVICH:  Yes, Your Honor.  Just, for the record, Mr. James McLaughlin from the Washington Post and Amy Jeffress, who is also counsel to Ms. Nakashima.

THE COURT:  All right.  Thank you.

All right.  Mr. Latcovich, this is your motion.

MR. LATCOVICH:  Yes, it is, Your Honor.  Thank you and good morning.

THE COURT:  Good morning.

MR. LATCOVICH:  May it please the court.  We represent Ellen Nakashima.

The subpoena here should be quashed for the simple

—Tonia M. Harris OCR-USDC/EDVA 703-646-1438—

EASTERN DISTRICT OF VIRGINIA

———***UNDER SEAL***———

3

reason that its dominant purpose is not to investigate a crime.  The Administration has made no secret of what's contempt from Ms. Nakashima and the Washington Post.  It targeted her with a subpoena over a story that she never published based on her communications to the government, and without following its own procedural rules.  The evidence of improper purpose here is not speculative.  It's in the public record.  It's unrebutted and it's overwhelming.  This is precisely the type of abuse that the Supreme Court warned about in *Branzburg*, and is designed to be corrected by Rule 17(c)(2).

I think the governing standard, although I'm sure I'll be corrected by my friend here, the governing standard is not at dispute here, Your Honor.  I think a grand jury subpoena must be quashed when it's dominant purpose is illegitimate.

In the First Amendment context, the Fourth Circuit tells us that the Court is required to apply "special sensitivity" to whether the government has selected a target out of malice or intent to harass.  That said, I'm not sure that any special sensitivity is necessary here given the evidence.  Senior officials have called Ms. Nakashima's reporting, "A Nazi source garbage."  "Complete bull," expletive.  The director of national intelligence has called for Ms. Nakashima to be stripped of her Pulitzer prizes and

***UNDER SEAL***

4

there have even been vulgar calls for her imprisonment.

The government doesn't deny any of this.  They offer no evidence to the contrary.  So this is unrebutted.  Instead they respond with the presumption of regularity.  And I think that is, in this context, Your Honor, almost a borderline frivolous argument, for both case specific and more general reasons.

Let's start with case specific.  The Supreme Court in *R. Enterprises* tells us the presumption of regularity only applies when a subpoena is issued through "normal channels." But here, there's no dispute that the government didn't follow its own regulations in issuing this grand jury subpoena.  The DOJ regulations set forth at 5th 2850.10 require the DOJ to have reasonable grounds that a crime has occurred based on something different than the reporter sold communication.  The DOJ must take steps to obtain the information from somewhere else, and the government must attempt to negotiate with a journalist.  They did none of those things here.

So under the Supreme Court precedent, Your Honor, the failure to follow normal channels undermines the presumption of regularity here.  Even if that were not enough, we think there's additional case-specific facts that weigh against the application of presumption here.  If you consider what happened in January of 2026, Ms. Nakashima reaches out to ███ and ██████ for a comment on a story about events

-***UNDER SEAL***-

5

that were already in the public ether. █████████

██████████████████████████████████████████

██████████████████████████████████████████

████████████████████████████████████████

██████████████ .

When Ms. Nakashima contacted the government, it raised no national security objections, no request to stop reporting, no claim that the information, if published, would compromise national security. The only concern was that they asked that the Washington Post ████████████████ ████████████████████ which is a routine editorial accommodation. Ms. Nakashima ultimately set the story aside and it was never published. And the government now claims it has a national security determination, but that came weeks after the government responded to Ms. Nakashima and raised no concerns.

More broadly, Your Honor, context also matters here, as the Supreme Court held in *R. Enterprises*. And courts across this country have refused to extend the presumption of regularity to this Administration's conduct. Including a court to quash a grand jury subpoena on a federal reserve on nearly identical facts just weeks ago. But in any event, the presumption of regularity cannot carry the government when the record looks like this.

The government loses for an alternative reason, Your

***UNDER SEAL***

6

Honor, and that is they misread *Sterling* and *Shain*.  Both opinions directly quote *Branzburg* and hold that if there's evidence of harassment Courts apply a balancing test in the form of the qualified privilege.  The government has no response to this.  They make no arguments to overcome the qualified privilege.  They just presume that it does not exist.  And so put simply, Your Honor, if the Court read *Sterling* and *Shain* and *Branzburg* the same way we do, the government also loses for this independent reason.

Finally, Your Honor, I want to mention briefly to discuss the immunity order because the government makes much of this in its opposition.  I have two points.  One is procedural and one is substantive.  On the procedure point, Your Honor, on page 9 of its opposition, the government says that the immunity order reflects -- and I want to make sure I get this right -- that the Court would satisfy that Ms. Nakashima's testimony may be necessary in the public interest.

That's just wrong.  18 U.S.C. 6003, which governs immunity, says that a district court "shall" enter an immunity order upon the government's request.  The Court has no discretion.  In fact, the Court was never told what this investigation is about, that Ms. Nakashima was a reporter, et cetera.  So there's no way the Court could have made such a finding.  It was relying on the submission from the government

———***UNDER SEAL***———

7

that nearly quoted the standard.

As far as the substance in the immunity order, the Supreme Court in *Branzburg* did not warn against prosecuting journalists.  It warned against using grand jury subpoenas to "disrupt a reporter's relationship with his news sources." That's the harm here.  Compelling Ms. Nakashima to testify whatever immunity she holds, destroys the confidential relationships she's built over her long career.

So, Your Honor, I think that both the Supreme Court and the Fourth Circuit have been clear that grand juries cannot be used to harass reporters.  *Branzburg* warned against this, both *Shain* and *Sterling* noted a need to balance when there's evidence of harassment.

If these repeated ordinances from the Supreme Court and Fourth Circuit have any meaning, they must apply here. There's a documented years-long campaign targeting Ms. Nakashima personally and now we have a grand jury subpoena issued in violation of DOJ regulations about an article that was never published.  We respectfully request the Court quash the subpoena.

THE COURT:  All right.  A few questions for you.  I think I expect to hear from Mr. Kromberg about whether or not a reporter's privilege exist.  He takes position that one does not.  Do you agree that the Supreme Court hasn't recognized a reporter's privilege?

———Tonia M. Harris OCR-USDC/EDVA 703-646-1438———

EASTERN DISTRICT OF VIRGINIA

***UNDER SEAL***

8

MR. LATCOVICH: I don't -- I think in the main, Your Honor, I think *Branzburg* said that there is no reporter's privilege, but I do think it held out the idea that when there is a harassment there's a different balancing that goes on.

THE COURT: That is sort of getting to my point. I take it you are not proceeding under the view that there's some reporter's privilege but instead under the *Branzburg* sort of bad faith carveout or exception, or whatever other theory you created with that language.

MR. LATCOVICH: Well, I think we're preserving that argument for appeal, Your Honor, but I think at this point we've got to slide under the harassment bad faith prong to proceed under privilege, yes.

THE COURT: All right. I understand. Are you aware of the general subject of the investigation?

MR. LATCOVICH: The only thing that I know about the investigation was what communications that I had with government counsel, and that it related to █████████ ███████████████████████████████████████ ███████████

THE COURT: Right. That leads to my next and maybe my last question for you. In any way, do you challenge the breadth of the subpoena?

MR. LATCOVICH: Well, Your Honor, it's hard to challenge the breadth at this point, because it's a

Tonia M. Harris OCR-USDC/EDVA 703-646-1438

EASTERN DISTRICT OF VIRGINIA

***UNDER SEAL***

9

testimonial subpoena. And so, I don't know the full scope of the questions that she is going to ask. I do think, Your Honor, when it's about ████████████████████████, that is evidence of harassment as opposed to, you know, something that's targeted and focused on a specific topic.

THE COURT: Well, I'm focused on the Fourth Circuit standard and that requires, one, a legitimate purpose; two, limited in scope; three, specifically specific; and four, not overly broad.

MR. LATCOVICH: I do not -- based on the conversations that I've had with government counsel and, obviously, ████████████████████████████████ ████████████████████████████████ I don't think the government, as described to me, the government's investigation does not meet that standard because it was described much broader than that, ██████████████ ████████████

THE COURT: All right. Thank you. Mr. Kromberg.

MR. KROMBERG: There is a couple of points I would like to clarify. One, is the idea that Judge Giles didn't know what this case was about. I asked the Court to check with Judge Giles because I believe Judge Giles will say that she was notified about what this immunity was about.

THE COURT: I'm seeing -- I think you attached to your papers the actual immunity order, and I wasn't planning

***UNDER SEAL***

10

on focusing on the particular language in that, but my recollection is there's at least no names used or even subject matter what the investigation is.

MR. KROMBERG: Because it was an ex parte proceeding, being sensitive to being accused of not divulging all relevant facts to the Court, I made sure that Judge Giles's chambers was aware of the context of this particular immunity order. This was not one that was just submitted in the routine course, goes to the clerk's office, and it gets assigned and then comes back. This one was -- there was contact with Judge Giles's chambers to make sure she was aware of the context of this.

THE COURT: Well, without -- if you think that information is confidential or --

MR. KROMBERG: That the recipient of the person who we're seeking to compel was a reporter for the Washington Post who were interested in looking for -- I think the only thing I said was that she was a reporter from the Washington Post.

THE COURT: All right. Thank you.

MR. KROMBERG: Second, the idea that the regulation was not filed here is not correct, and the opposing counsel has zero basis for saying that. Before we even get to that, I would point out that the regulations says this policy is not intended to and does not create any right or benefits, substantive or procedural, enforceable at law or inequity by

***UNDER SEAL***

11

any party against the United States, its departments, agencies, or entities it offers its employees or agents or any other person.

THE COURT:  No, but I think the argument is more subtle or maybe more direct than that, which is that if you're relying on the presumption of regularity one might think that the government needs to follow its own policy.

MR. KROMBERG:  One might think that opposing counsel would tell the Court about the entire part of the regulation which says that the government should have -- in consideration, the government should have pursued negotiations with the affected member of the news media, unless the Attorney General determines that such a negotiation would pose a substantial threat to the integrity of the investigation, risk grave harm to national security, or present an imminent risk of death of serious bodily harm.  That's the regulation at (c)(4)(iii).

So there is zero basis to conclude that this regulation was not filed because it says right in there that there is an exception if the Attorney General makes that determination.

THE COURT:  Well, let's just walk through some of the provisions of it, at least that I have in my notes that I wanted to ask you about that relates to the policy.  And if you're telling me that you didn't follow the policy at all

***UNDER SEAL***

12

because you are relying on this exception that the Attorney General is allowed to sort of trump it --

MR. KROMBERG: We're not saying that we didn't follow the policy.

THE COURT: Okay. Excellent.

MR. KROMBERG: We did follow the policy.

THE COURT: Then I have questions for you.

MR. KROMBERG: But the policy also says that certain requirements do not have to be met under certain circumstances.

THE COURT: I understand. So I have questions for you.

What information did you have from sources other than news media sources to advance the subpoena?

MR. KROMBERG: In conversations with the FBI, we are trying to find the source of a leak that we tried to find -- first, I don't think I should be telling the witness to the grand jury subpoena what the government does in the course of a leak investigation.

THE COURT: I understand that and I thought you might suggest or give me that response. So I'm going to welcome you, at any point, if you think any question I have is confidential and you don't think that the recipient of the subpoena is entitled to it, you're welcome to submit it to me ex parte so I can consider it. I appreciate that point. If

Tonia M. Harris OCR-USDC/EDVA 703-646-1438

EASTERN DISTRICT OF VIRGINIA

---***UNDER SEAL***---

13

you'd like to provide me with additional information about that, I would like to have it.  Because you know, that's the first step is what information did you rely on other than the news media, because one might argue that what's going on here is an attempt to use the news reporter as an agent of the government, right, because, the facts, as I understand them, as they've been laid out, is that Ms. Nakashima sent an email, a Signal message to ████████████████.  They were, I think, on subsequent days ████████████████████████ ██████████████ some passage of time went by before the subpoena was issued.

          And during that period of time, the government responded and didn't mention anything about this being confidential information.  And one might -- I'll give you a chance, one might suspect or be skeptical of the idea that if the exception that you're relying on to the policy applied that it would have been much faster than it was, and if the government would have responded and said, hey, this is important national security information, we want you to refrain from publishing it.  But instead, the message was very different.  It was --

          MR. KROMBERG:  That's exactly opposite to what Mr. Latcovich told you.  Mr. Latcovich told you that the reporter was asked not to report a certain fact.

          THE COURT:  Not to report about ████████████

                              Tonia M. Harris OCR-USDC/EDVA 703-646-1438

EASTERN DISTRICT OF VIRGINIA

```
                    ***UNDER SEAL***
                                                        14
```

███████████████████████████████████████████. But what the investigation going on here and what the subpoena is seeking is much broader than that. Say, for example, if Ms. Nakashima had published the article, after receiving this response from the government, what would be the posture of this case then?

Reporter reaches out, says this is what I'm planning to report, hearing nothing from the government about it being confidential or sensitive or anything else, goes ahead and reports the information in the news. That didn't happen here.

MR. KROMBERG: I think you misunderstand the roles within the Department of Defense. The public affairs officer is not the security official who is supposed to tell the -- oh, no, this is really sensitive, please don't report it. Sometimes they do say that, and they did --

THE COURT: Well, was this the person that reporters have to talk to and are given point of contact information to talk to so they can vet things like this? This is, as I understand it, how the process works. I don't think reporters generally reach out to the top secret -- the security experts to --

MR. KROMBERG: Of course, but they -- they reach out to anyone who they -- who they believe will give them information. But when they reach out to the public affairs officer, it's for confirmation, I believe.

THE COURT: And one would think that the public

***UNDER SEAL***

15

affairs officer would then take a look at the information and say maybe this needs to go through a security expert.

MR. KROMBERG:  And nothing happens instantaneously in the Department of War, I can tell you that.

THE COURT:  Or in the government generally.

MR. KROMBERG:  In the government generally.

And I can tell you that based on my experience, the idea -- the fact that the investigation moved as swiftly as it did, was a fact because of the Department of War was very interested.  And as the Court has seen ███████████████ ███ ███████████████████████ thought that this was very important.  That ███████ took six weeks before he came down with that, and then the subpoena came after that.  But this is -- the Department of War was involved in military operations at the time, and I think it's unreasonable to say, oh, the public affairs officer should have immediately done something other than pass along what had happened.

THE COURT:  Well, if you're telling me that you had other source information that was providing information about this investigation, that you weren't relying entirely on Ms. Nakashima and her email and her Signal message, then one might have thought that there would have been some information that folks were aware of highlighting the confidentiality -- the confidential nature of this information.

MR. KROMBERG:  I'm sorry, I'm not following, Judge.

***UNDER SEAL***

16

The reporter calls -- sends a message with information that the public affairs officer is not expecting and the public affairs officer responds.  From another case I know from -- I know that public affairs officers are given guidance on what to say on questions that they expect to come up.  But when a question comes up that they don't expect, they don't have an answer necessarily, they do the best they can.

THE COURT:  This goes back to my first question, which I don't think you're prepared to answer today, but you may give me some additional information confidentially is what other information did you have other than from the news media source that was provided to you?

MR. KROMBERG:  If you're asking did we know that there was a leak before Ms. Nakashima provided that information, I think the answer is, no.  I think -- the reason we found out it was a leak was because she's provided that information to the public affairs officer.  I would say, Judge, this is a case where we have -- we're not interested in Ms. Nakashima.  We got immunity for her.  This is not a case where -- we're interested in who leaked that information.  That's important.  We want to find out.  You have seen the ████████████ who says I want to know who is leaking this.

THE COURT:  Well, that's not what he said, but at least in the document that I --

MR. KROMBERG:  That it's very -- it's harmful to

EASTERN DISTRICT OF VIRGINIA

---***UNDER SEAL***---

17

national security.

THE COURT:  Right.  But remember DOJ's policy says you can't rely solely on the information you received from a news media source.  It needs to be obtained from some other source or at least verified from some other source, and that doesn't appeared to have happened.  You just told me that you learned about this alleged leak from the news media source. That is exactly what I think some of these cases are talking about when they are talking about using the reporter as an arm of the government to conduct an investigation.

MR. KROMBERG:  If a reporter contacts us, we learned that there's a leak because the reporter has that information. We are trying to find the leak.  That's all that's happening here.

THE COURT:  Okay.  What negotiations did you have with her before issuing the subpoena?

MR. KROMBERG:  We did not have negotiations with her before issuing a subpoena.

THE COURT:  What was the extraordinary reason you needed the grand jury testimony seven weeks after the contact?

MR. KROMBERG:  Seven weeks as opposed to -- as opposed to less time?

THE COURT:  Yes.

MR. KROMBERG:  Oh.  Well, we --

THE COURT:  This is DOJ policy.  I'm just going

———***UNDER SEAL***———

18

through the elements of the policy.

MR. KROMBERG:  We wanted it in less time, but Mr. Latcovich asked for more time.  So we said, okay, we'll have more time.

THE COURT:  No, I'm talking about pre Mr. Latcovich. I'm talking about when the government learned of the email and the Signal message back in January to when they issued the subpoena in March.

MR. KROMBERG:  Well, it takes time to get information to come from the Department of War to the Department of Justice.

THE COURT:  What's the extraordinary reason.  I'm just trying to understand the DOJ policy and whether and if you complied with it?

MR. KROMBERG:  I do not know the extraordinary reason.  It is not -- this is an investigation involving many components of the Justice Department, many components of the Department of War.  I don't know what everyone else did.  I know that I am told that the Attorney General has authorized this.  I did not apply for the Attorney General's authorization.  That was my partner from DOJ whose role it is is to obtain those authorizations.  There is a memo I know that sets forth why things should be done that way.  I don't double check it.  I assume that if someone in the Justice department told me we have Attorney General

***UNDER SEAL***

19

authorization, then we have the Attorney General's authorization.  I'm not going back and say, "Well, have you complied with the policy?"  That's not my role.

THE COURT:  I'm not saying it's your role, but it is your role standing in front of me at this podium telling me what you -- when I say "you" I mean the Department of Justice did to comply with the its own policy and if -- can't answer those questions --

MR. KROMBERG:  We did comply.  I repeat, we did comply.  Just because Mr. Latcovich says we didn't comply that doesn't mean -- the policies says, as I read to you, if the Attorney General finds certain facts --

THE COURT:  Dial it down, dial it down.  We're not going to get into a shouting match.  I understand your position on that, but I just also want to understand if you did anything to satisfy any of the other requirements of the policy.  So let me ask you about the last one on my list from the policy.  What attempt was made to obtain the same information from other sources?

MR. KROMBERG:  I do not know that there was any other way to obtain -- the information of who the leaker was that gave it to Ms. Nakashima, there was no other way to get it from other sources.

THE COURT:  Well, there was widespread open reporting about this incident that is the subject of this

***UNDER SEAL***

20

subpoena and the subject supposedly of this investigation.

MR. KROMBERG:  I don't think that's true.

THE COURT:  It is true.  I can tell you it's true. I've looked for it.  I've seen it.  It's the counsel -- Ms. Nakashima referenced it.  It's all over the internet.

MR. KROMBERG:  Judge, I don't think you understand what the significant fact that is at issue is.

THE COURT:  Okay.  What is it?

MR. KROMBERG:  The fact -- well, again, I don't think I should be saying that --

THE COURT:  All right.  Well, I'll look forward to getting that.

MR. KROMBERG:  -- from what Mr. Latcovich said that the public affairs office said please don't publish.

THE COURT:  But not for national security reasons. I look forward to receiving from you, to the extent you want to provide it, information ex parte about that time.

MR. KROMBERG:  I'm sorry.  I misunderstood what you said.  Mr. Latcovich said don't publish -- she was asked not to publish this, and you're saying that was not for national security reasons?

THE COURT:  They were asked not to name the -- I'm sure one or both of you will correct me if I'm wrong.  She was asked not to refer to ████████████████████████ in her news reporting.

***UNDER SEAL***

21

MR. KROMBERG:  Yes.  That's exactly right.

THE COURT:  ███████████████████████████

██████████████████████████████████████████████

████████████████████████████████  and there was

news reporting about it in other people's open source

reporting that was widespread after this event.  Long before

March 2, 2026.  It was contemporaneous -- almost

contemporaneous.

MR. KROMBERG:  Then you will be -- your position is

different from that of the  ████████████████  who said that --

to the contrary.

THE COURT:  Okay.  All right.  What more would you

like to tell me?  I have other questions, but I want to give

you the opportunity to tell me everything you'd like.

MR. KROMBERG:  The basic point here is we're looking

for the leaker, sensitive information that  ███████████████

███████  told us would be -- was risk damage to the national

security.  We're not interested in Ms. Nakashima.  We're not

trying to prosecute her.  And in the case involving

Ms. Natanson, I stood up here and told you that we thought

that Ms. Natanson was involved in the offense.

THE COURT:  Well, I heard different things from

different people about Ms. Natanson, which is -- I don't think

necessarily addresses that issue, but I heard different things

from you that I heard from the other folks who spoke on that

***UNDER SEAL***

22

issue and different things that were reported publicly and different things that were put in various pleadings that were filed with the Court.

MR. KROMBERG:  My point is that I told you what I thought about Ms. Natanson and I'm telling you now that we don't think that about Ms. Nakashima, and that's why we sought immunity for her so that there's possibility of anyone thinking that we're trying to harass her.  What else could we have done to show that we weren't trying harass her.  We got her immunity.

THE COURT:  Some may be skeptical.  Some may think that actually a grant of immunity is a way to bring her in the room and make sure she answers every single question that she has to, notwithstanding any other First Amendment, Fourth Amendment, or Fifth Amendment rights she may have.  And some may also maybe skeptical believe that they are looking for an opportunity to create perjury.  But that's just a skeptical mind, right.

While we're on that, let's talk about the subject of the subpoena, because this is something that is on my mind. The subject of the testimony, as described by you, was a request for comment to ▇▇▇ in matters that may have been relevant to ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ ▇▇▇▇▇▇▇▇▇▇  How is that not wildly broad?

MR. KROMBERG:  What we want to ask for is the

———***UNDER SEAL***——

23

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. That's the only thing we want to ask for. But I don't --

THE COURT: That's not what you said.

MR. KROMBERG: We don't want to put in the subpoena the secret information. We don't want to identify the information that's secret because that would make -- somehow make a subpoena something that's a classified document.

THE COURT: Well, I'm just trying to address the Fourth Circuit standards, and if you can tell me how that request is -- has a legitimate purpose, is limited in scope, is sufficiently specific, and not overly broad, I'll be happy to hear it.

MR. KROMBERG: Asking the ▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.

THE COURT: Okay. I think you mentioned in your papers that -- I think you said, correct me if I'm wrong, that the grand jury investigation involves ▮▮▮▮▮▮▮ ▮▮▮▮.

MR. KROMBERG: That's correct.

THE COURT: ▮▮▮▮▮▮▮▮▮

MR. KROMBERG: ▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮

THE COURT: Do you remember what subsection that is? It's not a memory test. If you do, you do; if you don't, you, don't.

***UNDER SEAL***

24

MR. KROMBERG:  No.

THE COURT:  I understand.  So Mr. Latcovich has made the point that they have outlined a significant amount of information that relates to improper purpose, bad faith, and the like, and you've not contested any of that.

MR. KROMBERG:  Well, contested.  I can tell you that this case is nothing like that because unlike in the Federal Reserve case where -- there wasn't a crime or there was no evidence of a crime, it was --

THE COURT:  What was the purpose of the subpoena?

MR. KROMBERG:  For the Federal Reserve?

THE COURT:  Yes.

MR. KROMBERG:  To get information about potential fraud involving crossover [sic].  But here we have -- and you have evidence of a crime by someone.  We don't know who.  Not we're not suggesting -- the federal reserve they were saying -- the object was to make it look like *Powell* had done something wrong, but we're saying that has nothing to do with Ms. Nakashima.  We want to know who the leaker was.  And I would say in that case, the judge offered the government the opportunity to come forward with something and the government declined to come forward with anything.  And here, we've shown you -- the -- ███████████████████ says the disclosure of this information by the leaker was -- risked serious harm to national security.

Tonia M. Harris OCR-USDC/EDVA 703-646-1438

EASTERN DISTRICT OF VIRGINIA

***UNDER SEAL***

25

So I think this case is nothing like the *Powell* case, and it's nothing like the QueerDoc case where in the QueerDoc case that was -- that was quashed because the Court said, "The question before the Court is whether DOJ may use its administrative subpoena power to achieve what the Administration cannot accomplish through legislation: the elimination of medical care that Washington and other states explicitly protects.  The answer is no."  That has nothing to do with this.  We have identified a crime.  We're trying to find the leaker.  The leak, in the view of the Department of War, seriously risks, serious harm to the national security.  What are we suppose to do; not investigate it?

THE COURT:  Well, let's start with the *Branzburg* language about that.  It says that official harassment of the press undertaken, not for purposes of law enforcement, but to disrupt a reporter's relationship with his new sources has no justification and cannot stand.

What you're telling me is the sole reason you issued this subpoena to Ms. Natanson, after having not approached her in advance, after having done no investigation on your own -- and when I mean you, I mean DOJ, not you particularly -- having done nothing to verify any of the information that you provided, this -- just shoot a subpoena and say, hey, I want to know who your source is.

MR. KROMBERG:  I don't understand what you just

Tonia M. Harris OCR-USDC/EDVA 703-646-1438

EASTERN DISTRICT OF VIRGINIA

***UNDER SEAL***

26

said.  We did nothing?  Who said we did nothing?

THE COURT:  You told me you did nothing.  I asked you what you did to verify and you said nothing.  We got -- you said -- what you said we got her email and her Signal message, and we anted know who the leaker was.

MR. KROMBERG:  Yes, we don't know how could we find -- I also said that there are things that are processes that are done in any leak case to try -- the steps we take, but I don't think that we should be explaining to the reporters what the steps are we take.  That should not be taken as, oh, we did nothing.  And that's unfair because I told you that before, and you said, "Okay, tell me later."

THE COURT:  Yeah, that was in response to a different question, I believe.  I think when I asked you what you did to verify, you said "nothing."  We got --

MR. KROMBERG:  Verify that it was --

THE COURT:  The record is what it is.

MR. KROMBERG:  Verify what?  Verify that it was a leak?

THE COURT:  The record is what it is.

MR. KROMBERG:  Well, I would hope to clarify it.  What is it that we didn't verify?

THE COURT:  What is it that you do?  What did you do to verify any of the information that she provided to you?  You told me "Nothing."

Tonia M. Harris OCR-USDC/EDVA 703-646-1438

EASTERN DISTRICT OF VIRGINIA

***UNDER SEAL***

27

MR. KROMBERG:  I'm sorry.  I don't understand the question of:  What did we do to verify the information?  Verify that it was, in fact, damaging to national security?  We got a letter ███████████████████ █ ████████████ .

THE COURT:  Okay.

MR. KROMBERG:  What more can we do to verify that this is a crime?

THE COURT:  I think the question I asked you is what attempt did you do to obtain information -- what attempt did you make to obtain information from another source?  And you said, "Nothing."  You said you had her email and you had her Signal message and that was it.  I was just working through the DOJ policy.

I'm not looking to get into a shouting match with you.  So I think we need to dial back the tone, please.  But I want to go back to the improper purpose and the bad faith and the like, because, as I mentioned, the government -- or excuse me, movant's counsel has provided a host of information about improper purpose, and you've cited some cases in response to support your view that there wasn't any improper purpose here.

But my question to you is, In any of the cases that you've cited, was there the level of information that the government -- that the movant has provided today about the government's bad faith?

***UNDER SEAL***

28

MR. KROMBERG:  I don't know the answer to that.  I do know that we live in unusual times and if the argument of the witnesses is taken, then the government cannot investigate leak cases using a tool of ever going to the reporter because, for better or for worse, there is putative language by Roger Stone, "A Friend of the President."  And that could be used in every case.

THE COURT:  I agree with you that there was evidence of varying quality.  I agree with you on that point, but there also was some direct evidence of statements that were made, including treason and I can't remember the -- some of the other specifics.  I have them here.  I can go through them.

MR. KROMBERG:  I would note, Judge, that unlike in the *Powell* case where the anger at the chamber of the federal reserve had to do with lowering the interest rates, I think to the extent that there are people in the reaches of governments far above me, who go over the top in their language, what they are angry about is when you say treason that's because there's a fear or a belief that national security information is being distributed.

So I don't think that those cases are relevant to this case.  Yes, it's true, if it were up to me would people above me keep their mouths shut more, yeah.  But that has nothing to do with why we're here.

THE COURT:  Well, I mean you lean heavily into the

Tonia M. Harris OCR-USDC/EDVA 703-646-1438

EASTERN DISTRICT OF VIRGINIA

‒***UNDER SEAL***‒

29

presumption of regularity here, and as you mentioned, this is interesting times, and the evidence that the movants have gathered to suggest that maybe the presumption of regularity should not be extended to the Department of Justice is fairly vast.  Going back to the *Powell* case and some of the other recent decisions that are discussed, the presumption of regularity and whether or not it should be accepted are -- how do you respond to that?

MR. KROMBERG:  Well, the *Powell* case once again I mention that the judge said government show me something, and the government didn't do anything, and they relied only on the presumption of regularity.  In this case we have provided to you ███████████████████████████████████████ ███████████████████████████████████████ ██████████████████████████████, and he said that this was a crime ultimately.  He said that the disclosure of this information is a crime.

(Court reporter clarification. )

MR. KROMBERG:  Then I went backwards because, as the judge pointed out, he didn't actually say this was a crime, he said the disclosure of this information risked serious harm to national security.  So I think this is very different from the *Powell* case because, I believe, Judge, I mean I said we want a declaration here, because I don't want to be before you in -- in these times, relying solely on the presumption of

***UNDER SEAL***

30

regularity.  However, we not only have the presumption of regularity, which should count for something, but also ████████ and also the immunity, which is very, very different from those other cases.

THE COURT:  Well, one might view that differently as I mentioned, because you haven't convinced me that this is anything other than a fishing expedition.  That you had any information to go on other than this reporter's messages to the press officers at the various places she reached out to.  You discovered apparently that there was a leak from these messages and decided just to hit her with a subpoena to find out who it was, and I don't think that's the presumption of regularity.

MR. KROMBERG:  You said it again that we went without doing anything else, and I keep saying I'm not going to tell the witnesses what we do when we start an investigation.

THE COURT:  All right.  I'll await further information about that.  Anything more you would like to tell me?

MR. KROMBERG:  No, Your Honor.

THE COURT:  Mr. Latcovich?

MR. LATCOVICH:  Very briefly, Your Honor.  There was an exchange about the reach out to ████████████ for comment.  And I would point you to Ms. Nakashima

***UNDER SEAL***

31

declaration and the exhibit to that declaration.  We do see a response from ██████████████████████████ It's 24 hours later.

THE COURT:  Give me just a second.  What paragraph are you looking at?

MR. LATCOVICH:  It is a -- it's actually --

THE COURT:  I have it.

MR. LATCOVICH:  --  email attachment.

THE COURT:  To the declaration?

MR. LATCOVICH:  To the declaration, yes, Your Honor.

THE COURT:  Exhibit A?

MR. LATCOVICH:  Yes.

THE COURT:  All right.

MR. LATCOVICH:  And we see that Ms. Nakashima writes on January 14th and the response is in the morning of January 14th, and the response is later that day.  And it is a considered response, more than 24 hours later, the government took time to draft a statement and the government actually asked about when are you publishing, quote, Greatly appreciate your patience.  Sorry for the delay.  End quote.

Again, this does not feel like she is being warned off a story for national security implications.  I think that is telling.

Switching topics, Your Honor, to the government regulations.  I think Your Honor is aware of this, but in 50

***UNDER SEAL***

32

-- 28 CFR 50.10, part 4 covers these. There are -- there are six considerations. Counsel was talking about an exception to just the third of those six conditions, the government, in our opinion, failed to meet multiple of those conditions. I still don't understand what conclusion the government could have made, the Attorney General could have made. The negotiations would have posed a substantial threat to the integrity of the investigation.

THE COURT: She had been negotiating with the government already -- or not negotiating, she had been communicating with the government already.

MR. LATCOVICH: We had communications, and although Mr. Kromberg and I are -- we take our positions, and we actually have a pretty good relationship, I don't think our negotiations, I hope, have not risked great harm to national security today. But, again, it only applies to one of those prongs that we submit that they failed to follow multiple of those prongs. In terms of the claim that --

Well, given the current environment, we can't do any leak investigations. I just don't think that's right. I think the government has been doing leak investigations for many, many years without dropping grand jury subpoenas on reporters. So I think that's a false choice that the government is presenting to the Court.

THE COURT: I also think it doesn't necessarily

***UNDER SEAL***

33

match up with the facts here.  I get the general statement that this might prevent us from doing grand jury subpoenas at all to this particular person, but I think context matters and the facts surrounding this situation also matter, and it just so happens that there's been a long history, as you've identified in your papers, of targeting this particular reporter, and that means something, I think.

MR. LATCOVICH:  The last point I make, Your Honor, is a discussion about the *Powell* case.  I think, if anything, this case is worse than the *Powell* case, because we have a higher level of procedural irregularities in the sense that the regulations that govern here would not have applied in the case involving the federal reserve.  And so, I think, if anything, that's an additional factor that cautions in favor of quashing the subpoena here.

THE COURT:  All right.

MR. LATCOVICH:  Thank you, Your Honor.

THE COURT:  All right.  Thank you.  All right, well thank you all.  I'm going to take a look at it this and get you something.  Mr. Kromberg, if you want to get me anything, you're welcome to, you're not required to, but I'll get you something as soon as I can.

MR. KROMBERG:  Judge, just so you know I was going to be off next week.

THE COURT:  That's fine.  Do you need more time is

EASTERN DISTRICT OF VIRGINIA

———***UNDER SEAL***———

34

what you're telling me?

MR. KROMBERG:  Well, I'm always going to need time on something like this, because I have no -- this is not something that I do alone.  There are many pieces to this and it will take some time, but certainly not next week.

THE COURT:  I understand.  Thank you for that. Thank you all.

**(Proceedings adjourned at 12:01 p.m.)**

———Tonia M. Harris OCR-USDC/EDVA 703-646-1438———

EASTERN DISTRICT OF VIRGINIA

CERTIFICATE OF REPORTER

I, Tonia Harris, an Official Court Reporter for the Eastern District of Virginia, do hereby certify that I reported by machine shorthand, in my official capacity, the proceedings had and testimony adduced upon the GRAND JURY SUBPOENA in the case of the **UNITED STATES OF AMERICA versus UNDER SEAL,** CRIMINAL NO: 26-dm-1, in said court on the 22nd day of May, 2026.

I further certify that the foregoing 35 pages constitute the official transcript of said proceedings, as taken from my machine shorthand notes, my computer realtime display, together with the backup tape recording of said proceedings to the best of my ability.

In witness whereof, I have hereto subscribed my name, this May 27, 2026.

_____
Tonia M. Harris, RPR
Official Court Reporter

35